FILED
United States Court of Appeals
Tenth Circuit

May 2, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MICHAEL BASCUM SELSOR,

     Petitioner-Appellant,

v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary; DREW
EDMONDSON, Attorney General of
the State of Oklahoma,

     Respondents-Appellees.

No. 09-5180

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 4:CV-01-00721-CVE-TLW)**

Madeline S. Cohen, Assistant Federal Public Defender, Denver, Colorado,
(Raymond P. Moore, Federal Public Defender, Denver, Colorado; Dean
Sanderford, Research & Writing Attorney, Appellate Division, Denver, Colorado;
Gary Peterson, Oklahoma City, Oklahoma, with her on the briefs), for Petitioner-
Appellant.

Robert L. Whittaker, Assistant Attorney General, Criminal Division (W. A. Drew
Edmondson, Attorney General of Oklahoma, with him on the brief), Oklahoma
City, Oklahoma, for Respondents-Appellees.

Before **BRISCOE,** Chief Judge, **TYMKOVICH** and **GORSUCH**, Circuit Judges.

**BRISCOE**, Chief Judge.

Petitioner Michael Selsor, an Oklahoma state prisoner convicted of first degree murder and sentenced to death, appeals the district court's denial of his 28 U.S.C. § 2254 habeas petition. Selsor asserts seven issues on appeal: (1) whether a state appellate ruling allowing the prosecution at his retrial proceedings to seek the death penalty against him violated his due process rights; (2) whether the imposition of the death penalty at his retrial proceedings violated his rights under the Double Jeopardy Clause; (3) whether the state trial court violated his constitutional rights at the retrial proceedings by instructing the jury as to the elements of a post-crime first degree murder statute, rather than the elements of the pre-crime first degree murder statute under which he was originally charged; (4) whether the imposition of the death penalty at his retrial proceedings violated his rights under the Equal Protection Clause; (5) whether the prosecution acted vindictively, in violation of his due process rights, by seeking the death penalty at his retrial proceedings; (6) whether the penalty phase of his retrial proceedings was rendered fundamentally unfair by prosecutorial misconduct; and (7) whether the admission, during the penalty phase of the retrial proceedings, of testimony from the victim's family members regarding the appropriate sentence violated his rights under the Eighth Amendment. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

2

# I

## *Factual background*

The relevant underlying facts of this case were outlined in detail by the

Oklahoma Court of Criminal Appeals (OCCA) in addressing Selsor's most recent

direct appeal:

> At approximately 11:00 p.m. on September 15, 1975, Selsor and Richard Eugene Dodson robbed the U-TOTE-M convenience store at 5950 33rd West Avenue in Tulsa. Selsor and Dodson entered the store, each armed with a .22 caliber handgun. Employee Clayton Chandler was working at the cash register. Selsor approached Chandler, pulled his gun, and demanded the contents of the register. Dodson located employee Ina Morris, who was restocking the walk-in cooler. Dodson pointed his gun at her and ordered her to get down. Morris replied, "You've got to be kidding me." Dodson then fired a shot striking Morris in the shoulder.
>
> Chandler loaded a sack with money and handed it to Selsor, who then shot Chandler several times in the chest killing him. Upon hearing the shots, Dodson emptied his weapon through the cooler door at Morris. Morris was shot in the head, neck and shoulder, but survived. Selsor and Dodson then fled.
>
> On September 22, 1975, Selsor and Dodson were arrested in Santa Barbara, California. Selsor confessed this and other crimes to Detective John Evans of the Santa Barbara Police Department. In his confession, Selsor admitted that before entering the store, he and Dodson had agreed to leave no witnesses.

Selsor v. State (Selsor II), 2 P.3d 344, 347-48 (Okla. Crim. App. 2000) (internal

paragraph numbers omitted).

## *Selsor's original trial and direct appeal*

Following his arrest, Selsor "was charged in the District Court, Tulsa

County, with the offenses of Armed Robbery, CRF-75-2183; Shooting With Intent to Kill, CRF-75-2182; and, Murder in the First Degree, CRF-75-2181, After Former Conviction of a Felony." Selsor v. State (Selsor I), 562 P.2d 926, 927 (Okla. Crim. App. 1977). The case proceeded to trial in January 1976, and Selsor "was tried conjointly with co-defendant . . . Dodson."[1] Id. "A guilty verdict was returned as to all three charges [against Selsor], punishment being assessed at death for Murder in the First Degree; twenty (20) years' imprisonment for Shooting With Intent to Kill; and, twenty-five (25) years' imprisonment for Armed Robbery."[2] Id.

Selsor filed a direct appeal challenging his convictions and sentences. On April 6, 1977, the OCCA issued a published decision affirming all of Selsor's convictions, as well as the sentences imposed for the Shooting With Intent to Kill and Armed Robbery convictions. The OCCA, however, modified Selsor's death sentence to life imprisonment. In doing so, the OCCA concluded, consistent with its then-recent decision in Riggs v. Branch, 554 P.2d 823 (Okla. Crim. App. 1976), that the Oklahoma death penalty statute under which Selsor was sentenced, Okla. Stat. tit. 21, § 701.3 (1973), was unconstitutional. Selsor I, 562 P.2d at

---

[1] Both defendants were represented, over their respective objections, by the same two lawyers from the Tulsa County public defender's office. As discussed below, that joint representation was ultimately the basis for this court's 1996 decision to grant a writ of habeas corpus in Selsor's favor.

[2] Dodson was acquitted of first degree murder, but convicted of the other two charges.

4

927.

*Selsor's first application for state post-conviction relief*

On November 8, 1978, Selsor filed a pro se application for post-conviction relief in state district court. The application asserted a single claim for relief from his convictions, i.e., that "THE TRIAL COURT ERRED BY REQUIRING [Dodson] AND [Selsor] TO, OVER [their] OBJECTION, BE TRIED JOINTLY WITH THE SAME COUNSEL FROM THE PUBLIC DEFENDERS OFFICE." S. R., Vol. I at 160. On February 28, 1980, the state district court denied Selsor's application, noting that Selsor's claim had previously been rejected by the OCCA on direct appeal. The state district court's denial of post-conviction relief was affirmed by the OCCA on June 12, 1980.

*Selsor's second application for state post-conviction relief*

"On July 3, 1989, Selsor filed a second application for post-conviction relief in state court."[3] Selsor v. Kaiser (Kaiser II), 81 F.3d 1492, 1496 (10th Cir. 1996). "That application was denied on July 24, 1989, and that ruling was affirmed by the [OCCA] in an unpublished order on August 18, 1989." Id.

*Selsor's first federal habeas proceedings*

In October of 1991, Selsor filed a pro se petition for federal habeas relief

---

[3] The records from this proceeding were not included in the record before us, and Selsor's own brief, when referring to these proceedings, contains no citations to the record. Thus, it is unclear precisely what claim or claims Selsor asserted in his second application for state post-conviction relief.

5

pursuant to 28 U.S.C. § 2254 in the United States District Court for the Western District of Oklahoma. Selsor v. Kaiser (Kaiser I), 22 F.3d 1029, 1031 (10th Cir. 1994). Selsor's petition asserted "two grounds for relief: (1) he was denied his Sixth Amendment right to the effective assistance of counsel because of his attorney's conflict of interest—i.e., the same attorney represented both [Selsor] and Dodson; and (2) the separate convictions and sentences for felony murder and the underlying felony—i.e., armed robbery, violated the Double Jeopardy Clause of the Fifth Amendment." Id. The district court denied Selsor's petition on December 4, 1992. Id. In doing so, the district court addressed and rejected the ineffective assistance claim on the merits, but concluded that Selsor's double jeopardy claim was procedurally barred.

Selsor appealed the district court's ruling to this court. This court appointed a federal public defender to represent Selsor. On May 2, 1994, this court issued a published opinion reversing the decision of the district court and remanding for further proceedings. More specifically, this court concluded "that the district court applied the incorrect legal standard" to Selsor's Sixth Amendment claim, id. at 1033, and thus remanded the case to the district court to "determine whether: (1) [Selsor]'s objection at trial to the joint representation was timely, and, if so, (2) whether the trial court took 'adequate steps to ascertain whether the risk [of a conflict of interest] was too remote to warrant separate counsel,'" id. at 1033-34 (quoting Holloway v. Arkansas, 435 U.S. 475, 484

6

(1978)).

"On remand the district [court] concluded that Selsor's objection to the joint representation was timely." Kaiser II, 81 F.3d at 1496. "However, [the district court] held that the state trial court made an adequate inquiry into the possibility of a conflict of interest . . . ." Id. Thus, the district court "denied Selsor's petition." Id.

Selsor appealed again to this court. On April 8, 1996, this court issued a published opinion (Kaiser II) reversing the district court's ruling. In doing so, this court held "there was an actual conflict of interest that adversely affected counsel's performance on behalf of Selsor," resulting in "violations of Selsor's Sixth and Fourteenth Amendment rights to effective assistance of counsel." Id. at 1506. Accordingly, this court remanded the case to the district court "with directions to enter judgment invalidating Selsor's convictions . . . , but providing that such judgment [wa]s without prejudice to further proceedings by the state for retrial of [Selsor] within a reasonable time." Id.

*Selsor's new trial*

The Tulsa County District Attorney's Office initiated retrial proceedings in May of 1996. On August 6, 1996, the prosecution filed a Bill of Particulars alleging that Selsor "should be punished by Death" for "the offense of Murder in the First Degree, as charged in the [original] Information," as a result of the following aggravating circumstances: (1) "[t]he Defendant knowingly created a

7

great risk of death to more than one person"; (2) "[t]he murder was especially heinous, atrocious, or cruel"; (3) "[t]he murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution"; and (4) "[t]he existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." S. R., Vol. I at 191.

Selsor moved to strike the Bill of Particulars, arguing that "[a]llowing the State to seek the death penalty against [him would] violate[] the prohibition against ex post facto laws and expose [him] to more severe punishment than was lawful at the time [he] committed the alleged crime" of Murder in the First Degree. Id., Vol. II at 203. On July 20, 1997, on the eve of trial, the state trial court denied Selsor's motion. Selsor immediately petitioned the OCCA for a writ of mandamus and obtained from that court a stay of the impending trial. Id. at 288. On October 14, 1997, the OCCA issued a published decision affirming the trial court's decision. Selsor v. Turnbull, 947 P.2d 579 (Okla. Crim. App. 1997). In doing so, the OCCA expressly overturned its decision in Riggs (which concluded, in pertinent part, that the death penalty statutes enacted by the Oklahoma Legislature in 1976 changed the burden of proof to the detriment of criminal defendants, as compared to the burden of proof under the 1973 first degree murder statute), and then concluded that the filing of a Bill of Particulars under the contemporaneous death penalty statutes (i.e., statutes enacted in 1976 that remained effective in 1997) did not violate the prohibition against ex post

8

facto laws or implicate the Equal Protection Clause. Id. at 583.

Following the OCCA's decision, Selsor's retrial began on February 2, 1998. At the outset, Selsor's counsel moved to dismiss the charges against Selsor, arguing that the Information, which was filed in 1975 and which charged Selsor under the language of the 1973 first degree murder statute, alleged both "that . . . Selsor with premeditated design effect[ed] the death of Clayton Chandler and during the course of a robbery with firearms did kill Clayton Chandler." Tr., Vol. IV at 738. The state trial court overruled Selsor's motion. Id. at 739 ("I think that the Information, albeit old, properly informs Mr. Selsor of the charge that is against him."). At the conclusion of the government's first-stage evidence, the jury found Selsor guilty of the three charges against him, i.e., murder in the first degree, shooting with intent to kill, and robbery with firearms.

The second-stage proceedings began following a short recess. To prove the four alleged aggravating circumstances, the prosecution presented evidence that Selsor and Dodson committed four similar armed robberies shortly prior to the robbery of the Tulsa U-TOTE-M convenience store, two of which involved the actual use of violence against store clerks (specifically the shooting of one clerk by Selsor and the stabbing of another clerk by Dodson). The prosecution also presented evidence establishing that Selsor attempted to escape from prison in December 1984. Lastly, the prosecution presented testimony from the widow and daughter of Clayton Chandler, the murder victim in the case, and from Ina Morris,

9

the store clerk wounded by Dodson during the robbery. All three of these witnesses read into the record victim impact statements they had prepared prior to trial. As part of their testimony, each of these three witnesses testified that they agreed with the District Attorney's recommended sentence of death.

Selsor in turn presented testimony from a data entry clerk employed by the Tulsa County Sheriff's Department, who testified that during the nineteen months Selsor was confined in the Tulsa County Jail awaiting retrial, Selsor had no write-ups of any kind. Selsor also presented testimony from four current or former Oklahoma Department of Corrections employees, all of whom knew Selsor because of their contact with him during his post-trial incarceration. All four of these witnesses testified, in pertinent part, that, despite their being generally in favor of the death penalty, they disagreed with the District Attorney's recommended sentence of death for Selsor.

At the conclusion of the second-stage evidence, the jury found the existence of two of the four aggravating circumstances alleged by the prosecution: that Selsor knowingly created a great risk of death to more than one person, and that the murder was committed for the purpose of avoiding and preventing a lawful arrest. In turn, the jury fixed Selsor's punishment at death for the first degree murder conviction. As for the other two counts of conviction, the jury recommended life imprisonment for the shooting with intent to kill conviction, and twenty years' imprisonment for the robbery with firearms conviction.

The state trial court entered judgment consistent with the verdicts on May 6, 1998. The judgment stated, in pertinent part, that Selsor was found guilty of "MURDER, 1st DEGREE," in violation of "21-701.7," the 1976 murder statute enacted by the Oklahoma state legislature. S. R., Vol. III at 436.

### *Selsor's direct appeal from the new trial*

Selsor appealed his convictions and sentence to the OCCA. On May 10, 2000, the OCCA issued a published opinion affirming Selsor's first degree murder conviction and death sentence, as well as Selsor's shooting with intent to kill conviction and related sentence of life imprisonment, but reversing the conviction and sentence for robbery with firearms and remanding to the state trial court with instructions to dismiss that charge. Selsor II, 2 P.3d at 346. More specifically, the OCCA concluded that the robbery with firearms conviction "must be dismissed based upon double jeopardy because all the elements of Robbery with Firearms are included within the elements of the First Degree Murder pursuant to the 1973 statute." Id. at 351. Selsor filed a petition for writ of certiorari with the United States Supreme Court. That petition was denied on May 21, 2001. Selsor v. Oklahoma, 532 U.S. 1039 (2001).

### *The instant federal habeas proceedings*

Selsor initiated the instant federal habeas proceedings on October 3, 2001, by filing a motion for appointment of counsel. The district court granted Selsor's motion and, on May 20, 2002, Selsor's appointed counsel filed a petition for writ

11

of habeas corpus on Selsor's behalf asserting eighteen grounds for relief. Respondent filed a response to the petition, as well as a certified copy of the relevant state court records.

On September 29, 2009, the district court issued an opinion and order denying Selsor's petition in its entirety. On that same date, the district court entered judgment in favor of respondent and against Selsor. Following the entry of an amended judgment on November 24, 2009, Selsor moved for a certificate of appealability with respect to nine issues. The district court granted Selsor's motion. Of the nine issues on which a COA was granted, Selsor has since filed appellate pleadings addressing seven of those issues.

II

**A. Standard of review**

Because Selsor filed his federal habeas petition after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), AEDPA's provisions govern these proceedings. Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007). Under AEDPA, the standard of review applicable to a particular claim depends upon how that claim was resolved by the state courts. Id.

If a claim was addressed on the merits by the state courts, we may not grant federal habeas relief on the basis of that claim unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established

12

Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). "When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003). "Rather, we must be convinced that the application was also objectively unreasonable." Id. "This standard does not require our abject deference, . . . but nonetheless prohibits us from substituting our own judgment for that of the state court." Snow, 474 F.3d at 696 (internal quotation marks omitted).

If a claim was not resolved by the state courts on the merits and is not otherwise procedurally barred, our standard of review is more searching. That is, because § 2254(d)'s deferential standards of review do not apply in such circumstances, we review the district court's legal conclusions de novo and its factual findings, if any, for clear error. McLuckie, 337 F.3d at 1197.

## B. Analysis

### 1. Due process violation - OCCA's overruling of Riggs

Selsor contends, in Proposition One of his appellate brief, that the OCCA in Turnbull violated the Ex Post Facto Clause as applied to judicial decisions through the Due Process Clause by overruling its decision in Riggs and allowing

13

the prosecution at the retrial proceedings to seek the death penalty against him.

*a) Background information*

On June 29, 1972, the United States Supreme Court held that a Georgia state statute that allowed for unbridled jury discretion in the imposition of death sentences violated the Eighth and Fourteenth Amendments. Furman v. Georgia, 408 U.S. 238, 240 (1972); id. at 309-10 (Stewart, J., concurring); id. at 313 (White, J., concurring). In the wake of Furman, states generally responded in one of two ways. Some, like Georgia, "legislated standards to guide jury discretion" in the imposition of the death penalty. Woodson v. North Carolina, 428 U.S. 280, 299 (1976). Others "adopted mandatory measures" requiring the imposition of the death penalty for any person convicted of first degree murder (although the states doing so adopted differing definitions of the crime of first degree murder). Id.

Oklahoma fell into the latter camp. In 1973, the Oklahoma Legislature adopted a statutory scheme that mandated imposition of the death penalty for anyone convicted of first degree murder, and defined first degree murder as follows:

> Homicide, when perpetrated without authority of law and with a premeditated design to effect the death of the person killed, or of any other human being, is murder in the first degree in the following cases:
> 1. When perpetrated against any peace officer, prosecuting attorney, corrections employee or fireman engaged in the performance of his official duties;

14

2. When perpetrated by one committing or attempting to commit rape, kidnapping for the purpose of extortion, arson in the first degree, armed robbery or when death occurs following the sexual molestation of a child under the age of sixteen (16) years;

3. When perpetrated against any witness subpoenaed to testify at any preliminary hearing, trial or grand jury proceeding against the defendant who kills or procures the killing of the witness, or when perpetrated against any human being while intending to kill such witness;

4. When perpetrated against the President or Vice President of the United States of America, any official in the line of succession to the Presidency of the United States of America, the Governor or Lieutenant Governor of this state, a judge of any appellate court or court of record of this state, or any person actively engaged in a campaign for the office of the Presidency or Vice Presidency of the United States of America;

5. When perpetrated by any person engaged in the pirating of an aircraft, train, bus or other commercial vehicle for hire which regularly transports passengers;

6. When perpetrated by a person who effects the death of a human being in exchange for money or any other thing of value, or by the person procuring the killing;

7. Murder by a person under a sentence of life imprisonment in the penitentiary;

8. When perpetrated against two or more persons arising out of the same transaction or occurrence or series of events closely related in time and location;

9. When perpetrated against a child while in violation of Section 843, Title 21 of the Oklahoma Statutes; and

10. Intentional murder by the unlawful and malicious use of a bomb or of any similar explosive.

Okla. Stat. tit. 21, § 701.1 (1973).

These state legislative responses to Furman in turn led to new court challenges. On July 2, 1976, the United States Supreme Court issued a trio of decisions addressing the two general types of revised death penalty schemes. In Woodson, 428 U.S. at 305, and Roberts v. Louisiana, 428 U.S. 325, 336 (1976),

15

the Court held that mandatory death penalty schemes adopted by North Carolina and Louisiana, i.e., schemes under which a person convicted of first degree murder was automatically sentenced to death without consideration of the defendant's character and record or of the circumstances of the particular offense, violated the Eighth and Fourteenth Amendments. In the third decision issued that day, Gregg v. Georgia, 428 U.S. 153 (1976), the Court held that Georgia's post-Furman death penalty scheme, which provided for bifurcated capital trial proceedings, set forth specific procedures guiding the sentencing judge or jury in its selection of an appropriate sentence (including the consideration of aggravating and mitigating circumstances), and mandated expedited direct review by the Georgia Supreme Court "of the appropriateness of imposing the sentence of death in the particular case," id. at 166, survived Eighth Amendment scrutiny. Id. at 187, 207. In doing so, the Court held that "the concerns expressed in Furman that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance," and that "[a]s a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." Id. at 195.

Four days later, on July 6, 1976, the Supreme Court applied its decisions in

16

<u>Woodson</u> and <u>Roberts</u> and reversed six Oklahoma capital cases that were pending before it. <u>Williams v. Oklahoma</u>, 428 U.S. 907 (1976); <u>Justus v. Oklahoma</u>, 428 U.S. 907 (1976); <u>Rowbotham v. Oklahoma</u>, 428 U.S. 907 (1976); <u>Lusty v. Oklahoma</u>, 428 U.S. 907 (1976); <u>Green v. Oklahoma</u>, 428 U.S. 907 (1976); <u>Davis v. Oklahoma</u>, 428 U.S. 907 (1976). In doing so, the Supreme Court held that "[t]he imposition and carrying out of the death penalty under the law of Oklahoma constitute[d] cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." <u>Williams</u>, 428 U.S. at 907.

The Oklahoma legislature responded to these Supreme Court decisions by calling a special session, repealing the 1973 statute, and enacting, effective July 24, 1976, new first and second degree murder statutes. Importantly, for purposes of the instant appeal, the new statutes effectively expanded the definition of first degree murder by defining it in the following manner:

> A. A person commits murder in the first degree when he unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.
> B. A person also commits the crime of murder in the first degree when he takes the life of a human being, regardless of malice, in the commission of forcible rape, robbery with a dangerous weapon, kidnapping, escape from lawful custody, first degree burglary or first degree arson.

Okla. Stat. tit. 21, § 701.7 (1976). In other words, in contrast to the 1973 murder statute, which defined first degree murder to require both malice aforethought <u>and</u>

17

commission of the murder in one of several specified circumstances, the 1976

statute defined first degree murder to require only malice aforethought or

commission of the murder during one of several enumerated felonies.

The OCCA first addressed these judicial and legislative events in its Riggs

decision issued on September 2, 1976.  The petitioner in Riggs had been charged

with first degree murder under Oklahoma's 1973 death penalty statute.  However,

that charge was filed on July 9, 1976, three days after the Supreme Court held

Oklahoma's 1973 death penalty statute to be unconstitutional.  Immediately after

the charge was filed, Riggs responded by filing a petition for writ of habeas

corpus with the state trial court "alleging that the Supreme Court . . . had declared

Oklahoma's First Degree Murder Statute unconstitutional and thus he was being

illegally restrained."  Riggs, 554 P.2d at 824.  After the state trial court denied the

petition, Riggs appealed to the OCCA.  The OCCA noted at the outset that its task

was

> to determine the status of those defendants either charged or having
> committed the crime of Murder in the First Degree or Murder in the
> Second Degree, and those defendants convicted of said offenses prior
> to the effective date of our new [1976] murder statutes.  We find it
> appropriate to move with the necessary speed to clarify and attempt
> to fill what has been termed "the apparent void" in our Murder law
> prior to the effective date of our new homicide murder statute.

Id. at 825.  Continuing, the OCCA noted that

> [t]his determination [wa]s mandatory as to that class of defendants
> charged with or committing homicide murder prior to the effective
> date of our new statute; they cannot be tried under the new statute, as

18

> the evidentiary burden of proof under it ha[d] been changed to their detriment. * * * To [hold] otherwise in th[is] situation[] would be to violate the ex post facto provision of the Constitution of the United States, Article 1, Section 10. * * * For this reason the new homicide murder statute cannot be applied retroactively by judicial construction.

Id. (emphasis added).

The OCCA then addressed "the status of those defendants . . . convicted of First Degree Murder and sentenced to death prior to the enactment of the new [1976] statute." Id. "A threshold inquiry in resolving the status of th[is] class[] of defendants," id., the OCCA held, was "to examine the effect of the Supreme Court decisions upon the Oklahoma homicide murder statutes," id. at 825-26. Citing the Supreme Court's post-Woodson and Roberts reversal of the six pending Oklahoma capital cases, the OCCA "conclude[d] the death penalty as provided in 21 O.S.Supp.1973, § 701.3 [(the 1973 death penalty statute)], ha[d] been effectively stricken from [the] statute, which [itself had been] repealed." Id. at 827. However, the OCCA in turn concluded that "the remaining provisions of [Oklahoma's 1973] homicide murder statute remain[ed] in effect after the striking of the death penalty provision." Id. The OCCA then addressed "what constitute[d] the appropriate constitutionally permissible punishment which should befall [defendants] . . . convicted of murder in the first degree, or . . . committing the offense of murder in the first degree prior to 12:01 a.m. of July 24, 1976[, the date the 1976 murder statute became effective]." Id. at 828.

19

Noting that a section of the 1973 murder statute authorized the OCCA to exercise its discretion and modify a sentence of death, the OCCA concluded "that the alternative sentence [that could] be imposed against those individuals convicted of murder in the first degree prior to the effective date of [the] new murder homicide statute [wa]s life imprisonment." Id. at 829. As for "individual[s] committing, but not convicted of, the crime of murder in the first degree prior to 12:01 a.m., July 24, 1976," the OCCA held, "the appropriate penalty for murder in the first degree [wa]s 'life in the penitentiary at hard labor,' under the 1973 statute." Id.

On June 17, 1977, approximately nine months after the issuance of Riggs, the Supreme Court issued its opinion in Dobbert v. Florida, 432 U.S. 196 (1977). The petitioner in Dobbert was a Florida state prisoner convicted of two murders and sentenced to death. "The murders of which petitioner was convicted were alleged to have occurred" in late 1971 and early 1972. Id. at 288. "During that period of time, Fla. Stat. Ann. §§ 775.082 (1971) and 921.141 (Supp.1971-1972), as then written, provided that a person convicted of a capital felony was to be punished by death unless the verdict included a recommendation of mercy by a majority of the jury." Id. "[O]n July 17, 1972, . . . the Florida Supreme Court found the 1971 Florida death penalty statutes inconsistent with Furman." Id. "Late in 1972 Florida enacted a new death penalty procedure," id., under which the trial judge, after considering the recommendation of a sentencing jury, was

20

required to "weigh eight aggravating factors against seven statutory mitigating factors to determine whether the death penalty should be imposed," Proffitt v. Florida, 428 U.S. 242, 242 (1976).[4] The petitioner in Dobbert "argue[d] that the change in the role of the judge and jury in the imposition of the death sentence in Florida between the time of the first-degree murder [he committed] and the time of [his] trial constitute[d] an *ex post facto* violation." 432 U.S. at 292 (italics in original). The Supreme Court rejected this argument, however, "conclud[ing] that the changes in the law [we]re procedural, and on the whole ameliorative, and that there [wa]s no *ex post facto* violation." Id. (italics in original). More specifically, the Supreme Court noted that "[t]he new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime." Id. at 293-94. The petitioner also asserted a "second *ex post facto* claim," i.e., "that at the time he" committed the murders "there was no death penalty 'in effect' in Florida . . . because the earlier statute enacted by the legislature was, after the time he acted, found by the Supreme Court of Florida to be invalid under . . . Furman . . . ." Id. at 297 (italics in original). In other words, petitioner argued,

_____

[4] It is significant to note that although the Florida legislature in late 1972 altered the state's procedural scheme for imposition of the death penalty, it did not substantially alter the pre-existing definition of murder in the first degree. See Fla. Stat. § 782.04 (2010), Amendment Notes (explaining historical changes to statute).

21

"there was no 'valid' death penalty in effect in Florida as of the date of his actions." Id. The Supreme Court disagreed, stating that petitioner's "sophistic argument mock[ed] the substance of the *Ex Post Facto* Clause." Id. (italics in original). According to the Court, "the existence of the [first degree murder] statute served as an 'operative fact' to warn the petitioner of the penalty which Florida would seek to impose on him if he were convicted of first-degree murder," and [t]his was sufficient compliance with the *ex post facto* provision of the United States Constitution." Id. at 298 (italics in original).

The final relevant piece of procedural history occurred in 1997. At that time, Selsor was being retried in state court pursuant to this court's decision in Kaiser II. Selsor moved to strike the Bill of Particulars filed by the prosecution, arguing that "[a]llowing the State to seek the death penalty against [him would] violate[] the prohibition against ex post facto laws and expose [him] to more severe punishment than was lawful at the time [he] committed the alleged crime" of Murder in the First Degree. S. R., Vol. II at 203. The state trial court denied Selsor's motion, and Selsor immediately petitioned the OCCA for a writ of mandamus. On October 14, 1997, the OCCA issued its decision in Turnbull and, at the urging of the prosecution, expressly overturned its decision in Riggs. In doing so, the OCCA stated:

> Riggs was decided during the chaos caused when the United States Supreme Court overturned the death penalty statutes of several states, and during the scramble by those states to ensure there were

22

constitutional penalty provisions in place for the offense of Murder in the First Degree. Riggs, 554 P.2d at 824-25 nn.1-3. This Court attempted to analyze United States Supreme Court precedent in effect at the time, and determined that Riggs, and other defendants who had committed homicide murder while the statutes with unconstitutional death penalty provisions were in effect, could not be tried under newly enacted statutes. Riggs, 554 P.2d at 825. This Court found the evidentiary burden of proof under the newly enacted statutes had been changed to the detriment of Riggs and the other defendants, and to apply the newly enacted statutes to them would be to violate the ex post facto provisions of the Constitution of the United States. Id.

After this Court attempted to construe federal ex post facto law in Riggs, the United States Supreme Court directly addressed the issue of whether the ex post facto clause prohibited the application, of newly enacted statutes for imposing the death penalty, to defendants whose crimes were committed prior to the enactment of the new statutes. Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In its ex post facto analysis, the Supreme Court compared the newly enacted statutes to the statutes in effect on the date the crime was committed, even though the old statutes, like Section 701.3, had been declared unconstitutional. The United States Supreme Court held the changes in death penalty statutes were procedural and on the whole ameliorative, and could be applied retroactively without an ex post facto violation. Id.

In different contexts, this Court has adopted and applied the reasoning and analysis of Dobbert. Cartwright v. State, 778 P.2d 479 (Okl.Cr.1989). This Court has acknowledged an ex post facto argument is not won by proving disadvantage alone. Cartwright, 778 P.2d at 482. In addition, the true focus of ex post facto analysis is on (1) the elements of the offense, (2) the conditions and quantum of punishment, and (3) the quantity and degree of proof necessary to establish guilt. Id.

Contrary to Petitioner's arguments, there was a death penalty statute in effect in 1975, and on the date his crime was committed, in the form of 21 O.S.Supp.1973, § 701.3. Contrary to this Court's analysis in Riggs, the newly enacted death penalty statutes did not change the burden of proof to the detriment of Riggs and other defendants, as compared to the burden of proof under Section 701.3.

23

Under Section 701.3, the only available sentence was death. Under newly enacted death penalty statutes, the sentencing options increased in favor of a defendant to include not only death but also the possibility of life imprisonment, and now life without parole. 21 O.S.Supp.1976, §§ 701.9 and 701.10; 21 O.S.1991, § 701.9, and Supp.1996, § 701.10. Under Section 701.3, the State was only required to prove the elements of the crime of First Degree Murder. Once those elements were proven, the State had no further burden of proof because the death penalty was required. Under newly enacted death penalty statutes, the State not only must prove the same elements of the crime of First Degree Murder, but also must prove aggravating circumstances before the death penalty can be imposed. Id. Therefore, newly enacted death penalty statutes (1) did not increase the elements of the offense of First Degree Murder, (2) did not increase but in fact decreased the conditions and quantum of punishment, and (3) did not decrease but in fact increased the quantity and degree of proof necessary to establish guilt, and are not ex post facto. Dobbert, supra; Cartwright, supra. The ex post facto analysis and the holdings thereunder in Riggs v. Branch, 554 P.2d 823 (Okl.Cr.1976) are hereby overturned.

Ex post facto analysis only applies to legislative enactments, however, changes in the law by judicial construction, such as overturning Riggs, implicates the Due Process Clause and requires consideration of ex post facto principles. Cartwright, 778 P.2d at 482. This Court has previously addressed the retroactive application of a judicial interpretation of a statute, which changed the law thus allowing independent reweighing of aggravating and mitigating circumstances and denying defendants automatic modification of a death sentence to life imprisonment, and found the Due Process Clause was not violated under an ex post facto analysis. Castro v. State, 749 P.2d 1146 (Okl.Cr.1987), cert. denied 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988). Similarly, the change in law by judicial decision that Riggs should be overturned does not violate the Due Process Clause or ex post facto principles, because it does not change the crime for which Petitioner is charged, increase the punishment prescribed therefor, or increase the quantity or degree of proof necessary to establish his guilt. Castro, 749 P.2d at 1151.

Petitioner's equal protection claim can be easily and summarily disposed of. Petitioner is simply no longer similarly situated to those

24

defendants subject to Oklahoma's unconstitutional death penalty statute, 21 O.S.Supp.1973, § 701.3, or to those defendants whose sentences were modified in accordance with Riggs. Petitioner's Judgment and Sentence has been vacated and he stands before this Court, similarly situated to defendants awaiting trial under current murder and death penalty statutes. Dobbert, 432 U.S. at 301, 97 S.Ct. at 2302, 53 L.Ed.2d at 361; see also Cheatham v. State, 900 P.2d 414, 428-30 (Okl.Cr.1995).

Finally, we reject Petitioner's claim that to subject him to the death penalty, because his Sixth Amendment right to effective assistance of counsel was violated, flies in the face of due process. Petitioner has not supported this claim with citation to any authority. Rule 3.5(C)(4), *Rules [of the Court of Criminal Appeals]*. Moreover, if a defendant has not been acquitted of the death penalty and his conviction and sentence are reversed on appeal or collateral proceedings, the slate is wiped clean and a defendant may be subjected to any punishment authorized by law, including death. Salazar v. State, 919 P.2d 1120, 1127 (Okl.Cr.1996). Finally, subjecting Petitioner to the death penalty does not appear to be punishment for Petitioner's successful attack on his Judgment and Sentence, but merely an application of the correct law, and/or a correction of the applicable law. See Stafford v. State, 800 P.2d 738, 740 (Okl.Cr.1990).

947 P.2d at 582-83.

*b) Selsor's arguments*

Selsor contends that "the OCCA both unreasonably applied clearly established federal law and deprived [him] of due process" when, in Turnbull, it "constru[ed] its 1976 decision in Riggs[] to mean something no reasonable person would have understood that case to mean, overruling this purported holding, and applying the overruling retroactively to [him], thereby permitting the State to obtain a death sentence against him." Aplt. Br. at 21-22. In support, Selsor

25

contends that "Riggs held that even if someone in [his] position were retried for murder, he faced a maximum sentence of life imprisonment." Id. at 22. According to Selsor, he "reasonably relied on [Riggs] when he pursued post-conviction relief," believing he could not again be subjected to a sentence of death. Id. Selsor argues that the OCCA's "Turnbull decision, overruling Riggs, was both unforeseeable and indefensible" because "Riggs had stood unchallenged for two decades, had produced the very result the State requested in that case, had provided the basis for [his] life sentence, and had been cited only with approval by the OCCA." Id. In turn, Selsor contends that "[t]he due process question . . . is whether [he] had fair warning when he collaterally attacked his unconstitutional conviction that he could be resentenced to death if he secured a new trial." Id. at 33.

*c) Clearly established federal law applicable to the issue*

Selsor contends, citing Bouie v. City of Columbia, 378 U.S. 347, 353-54 (1964), that "[w]hen a state court <u>unforeseeably</u> changes the scope of a criminal law, and applies that change retroactively, to a defendant's detriment, it violates the Due Process Clause."[5] Aplt. Br. at 32 (emphasis in original). Bouie "arose

_____

[5] Selsor also quotes and cites the Supreme Court's decision in Rogers v. Tennessee, 532 U.S. 451 (2001). Aplt. Br. at 32-33. Rogers, however, was issued approximately four years after the OCCA's decision in Turnbull. Consequently, Rogers cannot be treated as part of the "clearly established Federal law" we must consider in reviewing the OCCA's Turnbull decision under the
(continued...)

26

out of a 'sit-in' demonstration at Eckerd's Drug Store in Columbia, South

Carolina," on March 14, 1960. 378 U.S. at 348. The petitioners, "two Negro

college students, took seats in a booth in the restaurant department at Eckerd's,"

"which was reserved for whites," "and waited to be served." Id. "After they

were seated, an employee of the store put up a chain with a 'no trespassing' sign

attached." Id. After refusing to leave, petitioners were eventually arrested and

charged with breach of the peace, resisting arrest, and criminal trespass.

Petitioners were subsequently acquitted of breach of the peace, but convicted of

resisting arrest and criminal trespass. On direct appeal, the South Carolina

Supreme Court reversed the resisting arrest charges due to insufficient evidence,

but affirmed the criminal trespass convictions. Petitioners subsequently sought

and were granted certiorari review by the United States Supreme Court.

Before the Supreme Court, petitioners argued, in pertinent part, "that they

were denied due process of law . . . because the [trespass] statute failed to afford

---

[5](...continued)
deferential standard of review outlined in 28 U.S.C. § 2254(d)(1). See Lockyer v. Andrade, 538 U.S. 63, (2003) (holding that "'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."). This does not, however, appear to have any impact whatsoever on our resolution of Selsor's due process claim. Indeed, as we outline below in our discussion of Selsor's ex post facto claim, Rogers appears to have narrowed the reach of the Bouie decision, and thus Rogers lends no support to Selsor's due process claim. As the Supreme Court's interpretation of the Due Process Clause in Bouie can be read more broadly than its later rulings in Rogers, it is to Selsor's benefit that we apply Bouie to this claim challenging the OCCA's overruling of Riggs.

fair warning that the conduct for which they [were] convicted had been made a crime." Id. at 349. In support, petitioners noted that although the statute of conviction prohibited "entry upon the lands of another . . . after notice from the owner or tenant prohibiting such entry," id., the South Carolina Supreme Court, in affirming their convictions, had "construed the statute to cover not only the act of entry on the premises of another after receiving notice not to enter, but also the act of remaining on the premises of another after receiving notice to leave," id. at 350. Petitioners argued "that by applying such a construction of the statute to affirm their convictions . . . , the State . . . punished them for conduct that was not criminal at the time they committed it, and hence . . . violated the requirement of the Due Process Clause that a criminal statute give fair warning of the conduct which it prohibits." Id.

In addressing petitioners' argument, the Supreme Court began by acknowledging "[t]he basic principle that a criminal statute must give fair warning of the conduct that it makes a crime . . . ." Id. In turn, the Court held "[t]here can be no doubt that a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." Id. at 352. Indeed, the Court noted, "an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids." Id. at 353 (italics in

28

original). And, the Court emphasized, "[i]f a state legislature is barred by the *Ex Post Facto* Clause from passing [an ex post facto] law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction." Id. at 353-54 (italics in original). Thus, the Court held, "[w]hen a[n] . . . unforeseeable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime." Id. at 354-55. Finally, applying these principles to the facts before it, the Court "agree[d] with petitioners that" the statute of conviction "did not give them fair warning, at the time of their conduct . . . , that the act for which they . . . st[oo]d convicted was rendered criminal by the statute." Id. at 355.

Selsor also suggests that Lankford v. Idaho, 500 U.S. 110 (1991), is relevant to, and supportive of, his due process claim.[6] The petitioner in Lankford, an Idaho state criminal defendant, was charged with two counts of first-degree

---

[6] On March 1, 2011, Selsor filed a notice of supplemental authority pursuant to Fed. R. App. P. 28(j) identifying three additional authorities in support of his due process claim: NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 456-57 (1958); Saint Francis College v. Al-Khazraji, 481 U.S. 605, 608-09 (1987); and Wiley v. Epps, 625 F.3d 199, 211 (5th Cir. 2010). Notably, Selsor did not cite either of the two Supreme Court cases in the appellate brief he filed with the OCCA raising the due process issue. And Wiley, aside from being a circuit rather than a Supreme Court decision, was decided long after the OCCA addressed the due process issue. In any event, we are not persuaded that any of these decisions are relevant to Selsor's due process issue.

29

murder and advised by the trial judge at the time of arraignment that the maximum punishment on either charge was life imprisonment or death. The petitioner was subsequently convicted by a jury of both counts. In response to a presentencing order issued by the trial judge, the prosecution advised petitioner and the trial judge that it would not be seeking the death penalty. Consequently, at the sentencing hearing, neither side discussed the death penalty as a possible sentence. At the conclusion of the sentencing hearing, however, the trial judge concluded that the petitioner's crimes warranted punishment more severe than that recommended by the prosecution, and sentenced petitioner to death on the basis of five aggravating circumstances. On appeal, the Idaho Supreme Court rejected petitioner's claim that the trial judge violated the Due Process Clause by failing to give notice of his intention to consider imposing the death sentence despite the prosecution's notice that it was not seeking that penalty. In so ruling, the Idaho Supreme Court held that the trial judge's express advisement at the time of arraignment, combined with the terms of the Idaho Code, provided sufficient notice that the death penalty might be imposed.

The Supreme Court granted certiorari "to decide whether the sentencing process followed in th[e] . . . case satisfied the requirements of the Due Process Clause of the Fourteenth Amendment." Id. at 111. At the outset of its opinion, the Court emphasized two undisputed facts: first, "that the character of the sentencing proceeding did not provide petitioner with any indication that the trial

30

judge contemplated death as a sentence," id. at 119; and second, that "[t]he presentencing order entered by the trial court requiring the [prosecution] to advise whether it sought the death penalty, and if so, requiring the parties to specify the aggravating and mitigating circumstances on which they intended to rely, was comparable to a pretrial order limiting the issues to be tried," id. at 120. The Court also presumed that "[i]f defense counsel had been notified that the trial judge was contemplating a death sentence based on five specific aggravating circumstances, . . . she would have advanced arguments that addressed these circumstances . . . ." Id. at 122. Based upon these facts and this presumption, the Court concluded that the trial judge's "silence following the [prosecution]'s response to the presentencing order had the practical effect of concealing from the parties the principal issue to be decided at the hearing." Id. at 126. "Notice of issues to be resolved by the adversary process," the Court emphasized, "is a fundamental characteristic of fair procedure." Id. In sum, the Court held, "[p]etitioner's lack of adequate notice that the judge was contemplating the imposition of the death sentence created an impermissible risk that the adversary process may have malfunctioned in th[e] case." Id. at 127. Consequently, the Court reversed the judgment of the Idaho Supreme Court and remanded the case for further proceedings. Id. at 128.

d) *The OCCA's ruling on the issue*

In Turnbull, in which Selsor sought mandamus relief on the eve of his

31

retrial, the OCCA sua sponte addressed and rejected the question of whether its overruling of Riggs violated Selsor's due process rights.  On direct appeal following his 1998 retrial, Selsor asked the OCCA to revisit the issue.  The OCCA again concluded that no due process violation occurred, stating as follows:

> In Selsor v. Turnbull, this Court . . . anticipated and resolved [an] issue[] Selsor failed specifically to raise then but which he raises now in Proposition[] . . . III . . . : whether the retroactive application of this Court's decision overruling Riggs v. Branch violated due process.  * * *  This Court . . . found that the retroactive application of this Court's decision overruling Riggs v. Branch to this case did not violate due process.  We specifically stated: "the change in law by judicial decision that Riggs should be overturned does not violate due process . . . because it does not change the crime for which [Selsor] is charged, increase the punishment prescribed therefore, or increase the quantity, or degree of proof necessary to establish his guilt."  In sum, Selsor's argument[] in Proposition[] . . . III w[as] adequately resolved in Selsor v. Turnbull; nothing in his brief is convincing or persuasive enough to change those results.

Selsor II, 2 P.3d at 349-50.

*e) § 2254 analysis*

The OCCA's resolution of Selsor's due process issue was neither contrary to, nor an unreasonable application of, Bouie.[7]  To begin with, Selsor's case

---

[7] The OCCA's decision in Turnbull was erroneous in one key respect: the OCCA was mistaken in concluding that "the newly enacted death penalty statutes did not change the burden of proof to the detriment of Riggs and other defendants, as compared to the burden of proof under Section 701.3."  947 P.2d at 582.  In reaching this conclusion, the OCCA overlooked a key difference between the Florida statute at issue in Dobbert and the Oklahoma statute at issue before it.  As previously noted, the changes implemented by Florida to its murder scheme did not alter the definition of first degree murder.  In contrast, Oklahoma's 1976

(continued...)

32

differs from <u>Bouie</u> in terms of the substance of the judicial decision at issue: whereas the South Carolina Supreme Court in <u>Bouie</u> was interpreting the scope of a criminal statute, the OCCA in <u>Turnbull</u> was revisiting one of its own decisions involving an issue of constitutional law (i.e., whether application of the punishment scheme set forth in Oklahoma's 1976 murder statute to defendants charged with violating the prior 1973 murder statute violated the prohibition against *ex post facto* laws). Moreover, even ignoring this distinction, the OCCA's reversal of <u>Riggs</u> in <u>Turnbull</u> did not have an ex post facto effect. Specifically, by concluding, contrary to its decision in <u>Riggs</u>, that defendants charged with violating Oklahoma's 1973 murder statute could be sentenced to death, the OCCA in <u>Turnbull</u> did not authorize a greater punishment "than the law annexed to the crime . . . when committed." <u>Calder v. Bull</u>, 3 U.S. (3 Dall.) 386, 390 (1798) (outlining four types of ex post facto criminal laws); <u>see</u> <u>Johnson v. United States</u>, 529 U.S. 694, 699 (2000) ("To prevail on this sort of ex post facto claim, [a defendant] must show both that the law [or decision] he challenges operates retroactively . . . and that it raises the penalty from whatever the law provided when he acted."). At the time Selsor murdered Clayton Chandler, Oklahoma's

---

[7](...continued)
murder statute altered the definition of first degree murder to require proof of either (but not both) of the two critical elements required under the 1973 murder statute (i.e., malice aforethought and commission of the murder during a statutorily designated felony offense). But the OCCA's error in this regard does not lend support to Selsor's due process claim.

33

1973 murder statute required imposition of the death penalty for any defendant convicted of first degree murder. Thus, because Turnbull did not "raise[] the penalty from what[] the law provided when [Selsor] acted," Johnson, 529 U.S. at 699, it did not have an ex post facto effect. And, because Turnbull did not have an ex post facto effect, it could not have violated the due process principles outlined in Bouie, i.e., in 1975, when Clayton Chandler was murdered, Selsor had "fair warning" that a conviction of first degree murder in Oklahoma would result in the death penalty.

Likewise, the OCCA's resolution of Selsor's due process issue was neither contrary to, nor an unreasonable application of, Lankford. Unlike the petitioner in Lankford, who was effectively deprived of notice that the trial judge was considering imposition of the death penalty, Selsor was afforded adequate notice of the prosecution's intent to seek the death penalty at the 1998 retrial proceedings. In turn, Selsor was able to utilize the adversary process to challenge (albeit unsuccessfully) the constitutionality of the prosecution's action. Thus, unlike the situation in Lankford, there was no "risk [in Selsor's case] that the adversary process may have malfunctioned . . . ." 500 U.S. at 127.

2. *Double jeopardy violation*

In Proposition Two of his appellate brief, Selsor contends that the OCCA effectively acquitted him of the death penalty in Selsor I when it modified his sentence to life imprisonment, and that, consequently, his resentencing to death

following his second trial violated his rights under the Double Jeopardy Clause.

*a) Clearly established federal law*

Between 1919 and 1980, the Supreme Court repeatedly held "that the Double Jeopardy Clause imposes no absolute prohibition against the imposition of a harsher sentence at retrial after a defendant has succeeded in having his original conviction set aside." Bullington v. Missouri, 451 U.S. 430, 438 (1981) (citing Stroud v. United States, 251 U.S. 15 (1919); North Carolina v. Pearce, 395 U.S. 711 (1969); Chaffin v. Stynchcombe, 412 U.S. 17 (1973); and United States v. DiFrancesco, 449 U.S. 117 (1980)). These holdings rest on the principle that the reversal of a defendant's conviction results in "the slate [being] wiped clean," and that, consequently, "whatever punishment has actually been suffered under the first conviction . . . is . . . an unmitigated fiction . . . ." Pearce, 395 U.S. at 721. Notably, "the sentencing procedures considered in [these] cases did not have the hallmarks of [a] trial on guilt or innocence," Bullington, 451 U.S. at 439, and thus "[t]he imposition of a particular sentence . . . [wa]s not regarded as an 'acquittal' of any more severe sentence that could have been imposed," id. at 438.

In Bullington, the Court granted certiorari to consider "whether the reasoning of [these cases] . . . appl[ied] under a system," specifically Missouri's 1978 capital murder scheme, "where a jury's sentencing decision is made at a bifurcated proceeding's second stage at which the prosecution has the burden of proving certain elements beyond a reasonable doubt before the death penalty may

35

be imposed." Id. at 432. The petitioner in Bullington was convicted by a jury of capital murder. At the ensuing penalty phase of the trial, the prosecution attempted to prove the existence of two aggravating circumstances. The jury, however, "returned its additional verdict fixing petitioner's punishment not at death, but at imprisonment for life without eligibility for probation or parole for 50 years." Id. at 435-36. Thereafter, the petitioner successfully moved for a new trial on the grounds "that Missouri's constitutional and statutory provisions allowing women to claim automatic exemption from jury service deprived [him] of his Sixth and Fourteenth Amendment right to a jury drawn from a fair cross-section of the community." Id. at 436.

On retrial, the prosecution served notice "that it intended again to seek the death penalty" on the basis of the "same aggravating circumstances" it attempted to prove at the first trial. Id. The petitioner "moved to strike the notice, arguing that the Double Jeopardy Clause . . . barred the imposition of the penalty of death when the first jury had declined to impose the death sentence." Id. After the trial court informally announced its intention to grant petitioner's motion to strike, the prosecution sought a writ of prohibition first from an intermediate state appellate court, and then from the Supreme Court of Missouri. The Supreme Court of Missouri "issued a preliminary writ of prohibition" and, "[a]fter argument, . . . sustained the [prosecution]'s position and made the writ absolute." Id. at 437. "It held that neither the Double Jeopardy Clause, nor the Eighth Amendment, nor the

36

Due Process Clause barred the imposition of the death penalty upon petitioner at his new trial . . . ." Id.

The United States Supreme Court, in granting certiorari and addressing the issues raised by petitioner, noted at the outset that "[t]he procedure that resulted in the imposition of the sentence of life imprisonment upon [the] petitioner . . . at his first trial . . . differ[ed] significantly from those employed in any of the Court's cases where the Double Jeopardy Clause ha[d] been held inapplicable to sentencing." Id. at 438. Specifically, the Court noted, the sentencing phase of the trial "resembled and, indeed, in all relevant respects was like the immediately preceding trial on the issue of guilt or innocence." Id. This procedural difference, the Court went on to conclude, "meant that the jury ha[d] already acquitted the [petitioner] of whatever was necessary to impose the death sentence," id. at 445 (internal quotation marks and citation omitted), and thus served to place the case within "an important exception . . . to the [clean slate] rule recognized in Pearce," id. at 442 (citing Burks v. United States, 437 U.S. 1 (1978)), i.e., that "Pearce is inapplicable whenever a jury agrees or an appellate court decides that the prosecution has not proved its case" against the defendant, id. at 443. In reaching this conclusion, the Court emphasized that "[t]he values that underlie th[e] principle" that "[a] verdict of acquittal on the issue of guilt or innocence is . . . absolutely final" "are equally applicable when a jury has rejected the State's claim that the defendant deserves to die . . . ." Id. at 445. Finally, the

37

Court emphasized that its decision did "not at all depend upon the [prosecution]'s announced intention to rely only upon the same aggravating circumstances it sought to prove at petitioner's first trial or upon its statement that it would introduce no new evidence in support of its contention that petitioner deserve[d] the death penalty." Id. at 446. "Having received one fair opportunity to offer whatever proof it could assemble," the Court held, "the State [wa]s not entitled to another." Id. (internal quotation marks and citation omitted).

Three years later, in Arizona v. Rumsey, 467 U.S. 203 (1984), the Supreme Court applied Bullington to reverse a death sentence imposed on an Arizona state defendant. The defendant therein was convicted by a jury of first degree murder and armed robbery, and sentenced by the trial judge to life imprisonment for the murder conviction and 21 years' imprisonment for the armed robbery conviction. In imposing the life sentence, the trial judge found that none of the three statutory aggravating factors alleged by the prosecution existed. On appeal, the prosecution "contended that the trial court had committed an error of law in interpreting the [alleged] pecuniary gain aggravating circumstance to apply only to contract killings." Rumsey, 467 U.S. at 207. The Arizona Supreme Court agreed and thus ordered "the sentence of life imprisonment . . . to be set aside and the matter remanded for redetermination of aggravating and mitigating circumstances and resentencing." Id. (internal quotation marks and citation omitted). "On remand the trial court held a new sentencing hearing," during

38

which the parties presented arguments but no new evidence.  Id.  The trial court ultimately found the presence of the pecuniary gain aggravating circumstance and sentenced the defendant to death for the murder conviction.  Id. at 208.  On direct appeal, the Arizona Supreme Court "concluded that, under . . . Bullington . . . , [defendant]'s [death] sentence violated the constitutional prohibition on double jeopardy" and "therefore ordered [the] sentence . . . reduced to life imprisonment . . . ."  Id. at 208-09.

The United States Supreme Court subsequently granted the state of Arizona's petition for writ of certiorari and affirmed the decision of the Arizona Supreme Court.  Id. at 209.  In doing so, the Supreme Court noted that "[t]he capital sentencing proceeding in Arizona share[d] the same characteristics of the Missouri proceeding [at issue in Bullington] that ma[d]e it resemble a trial for purposes of the Double Jeopardy Clause."  Id.  The Court in turn concluded that "[a]pplication of the Bullington principle render[ed] [defendant]'s death sentence a violation of the Double Jeopardy Clause because [defendant]'s initial sentence of life imprisonment was undoubtedly an acquittal on the merits of the central issue in the proceeding — whether death was the appropriate punishment for [defendant]'s offense."  Id. at 211.  More specifically, "[t]he trial court entered findings denying the existence of each of the seven statutory aggravating circumstances, and as required by state law, the court then entered judgment in [defendant]'s favor on the issue of death."  Id.  The Court held that the state trial

39

court's "judgment, based on findings sufficient to establish legal entitlement to the life sentence, amount[ed] to an acquittal on the merits and, as such, bar[red] any retrial of the appropriateness of the death penalty." Id. Lastly, the Court held that the trial court's reliance in the original sentencing proceeding "on a misconstruction of the pecuniary gain aggravating circumstance" did "not change the double jeopardy effects of a judgment that amount[ed] to an acquittal on the merits." Id. In other words, the Court held, "an acquittal on the merits bars retrial even if based on legal error." Id.

In 1986, the Court granted certiorari in another Arizona death penalty case to decide "whether the Double Jeopardy Clause bars a further capital sentencing proceeding when, on appeal from a sentence of death, the reviewing court finds the evidence insufficient to support the only aggravating factor on which the sentencing judge relied, but does not find the evidence insufficient to support the death penalty." Poland v. Arizona, 476 U.S. 147, 148 (1986). The two petitioners in Poland committed an armed robbery of "a Purolator van that was making cash deliveries to various banks in northern Arizona." Id. As part of the robbery, petitioners killed two armed guards by taking them "to a lake and dump[ing] them into the water in sacks weighted with rocks." Id. Petitioners were subsequently convicted by a jury in Arizona state court of first degree murder and sentenced to death by the trial judge. In support of the death sentences, the trial judge found that the murders were committed in an especially

40

heinous, cruel, or depraved manner. Although the prosecution argued the existence of another statutory aggravating factor, specifically that petitioners had committed the offense as consideration for the receipt, or in expectation of the receipt, of something of pecuniary value, the trial judge rejected it on the grounds that the aggravator encompassed only "contract killing[s]." Id. at 149.

On direct appeal, the Arizona Supreme Court concluded that the petitioners' convictions were "tainted by a jury-room discussion of evidence not admitted at trial," and accordingly reversed the convictions and ordered a retrial. Id. at 150. The Arizona Supreme Court also reviewed the sentencing proceedings and concluded that (a) the evidence "was insufficient to support a finding of the 'especially heinous, cruel, or depraved' aggravating circumstance," (b) the trial judge misinterpreted the law by concluding that the "pecuniary gain" aggravator was limited to situations involving contract killings, and (c) the trial judge could, if petitioners were again convicted of first degree murder, "find the existence of this aggravating circumstance." Id. (internal quotation marks and citation omitted).

On remand, the "petitioners were again convicted of first-degree murder." Id. At the sentencing hearing, the prosecution alleged the same two aggravators (the "especially heinous, cruel, or depraved" aggravator and the "pecuniary gain" aggravator) it had asserted at the original trial, as well as a third aggravator against one of the petitioners (that this petitioner was previously convicted of a

41

felony involving the use or threat of violence on another person). Id. "The trial judge found all of the aggravating circumstances alleged by the prosecution, and again sentenced both petitioners to death." Id.

"Petitioners argued on [direct] appeal . . . that the Double Jeopardy Clause barred reimposition of the death penalty" because, in their view, "the Arizona Supreme Court's decision on their first appeal that the evidence failed to support the 'especially heinous, cruel, or depraved' aggravating circumstance amounted to an 'acquittal' of the death penalty." Id. at 151. The Arizona Supreme Court rejected this argument, emphasizing that its earlier holding "'was simply that the death penalty could not be based solely upon [the "especially heinous, cruel, or depraved"] aggravating circumstance because there was insufficient evidence to support it.'" Id. (quoting State v. Poland, 698 P.2d 183, 199 (Ariz. 1985)). Although the Arizona Supreme Court agreed with petitioners that the evidence was insufficient to support the "especially heinous, cruel, or depraved" aggravator, it concluded the evidence was sufficient to support the other two aggravators and, after independently weighing the mitigating and aggravating circumstances, "concluded that the death penalty was appropriate in each petitioner's case." Id.

The United States Supreme Court subsequently "granted certiorari to consider whether reimposing the death penalties on petitioners violated the Double Jeopardy Clause." Id. Applying the principles outlined in Bullington and

Rumsey, the Court stated that "the relevant inquiry in the cases before [it] [wa]s whether the sentencing judge or the reviewing court ha[d] 'decid[ed] that the prosecution ha[d] not proved its case' for the death penalty and hence ha[d] 'acquitted' petitioners." Id. at 154 (quoting Bullington, 451 U.S. at 443). Addressing this question, the Court concluded that "[a]t no point during petitioners' first capital sentencing hearing and appeal did either the sentencer or the reviewing court hold that the prosecution had 'failed to prove its case' that petitioners deserved the death penalty." Id. Further, the Court rejected petitioners' argument "that the Arizona Supreme Court 'acquitted' them of the death penalty by finding the 'evidence [insufficient] to support the sole aggravating circumstances found by the sentencer.'" Id. at 155 (quoting petitioners' brief; brackets in original). More specifically, the Court "reject[ed] the fundamental premise of petitioners' argument, namely, that a capital sentencer's failure to find a particular aggravating circumstance alleged by the prosecution always constitutes an 'acquittal' of that circumstance for double jeopardy purposes." Id. "Bullington," the Court noted, "indicates that the proper inquiry is whether the sentencer or reviewing court has 'decided that the prosecution has not proved its case' that the death penalty is appropriate." Id. (emphasis in original). And, the Court further noted, it was "not prepared to extend Bullington further and view the capital sentencing hearing as a set of minitrials on the existence of each aggravating circumstance." Id. at 155-56.

43

Because "[a]ggravating circumstances . . . are 'standards to guide the making of [the] choice' between the alternative verdicts of death and life imprisonment," the Court stated, "the [trial] judge's finding of any particular aggravating circumstance does not of itself 'convict' a defendant (i.e., require the death penalty), and the failure to find any particular aggravating circumstances does not 'acquit' a defendant (i.e., preclude the death penalty). Id. at 156. Although the Court acknowledged "that the sentencer's finding, albeit erroneous, that no aggravating circumstance is present is an 'acquittal' barring a second death sentence proceeding," the Court emphasized "[t]his [wa]s because 'the law attaches particular significance to an acquittal.'" Id. (quoting United States v. Scott, 437 U.S. 82, 91 (1978)). "This concern with protecting the finality of acquittals is not implicated," the Court held, "when, as in the[] cases [before it], a defendant is sentenced to death, i.e., 'convicted.'" Id. The Court thus held "that the trial judge's rejection of the 'pecuniary gain' aggravating circumstance . . . was not an 'acquittal' of that circumstance for double jeopardy purposes, and did not foreclose its consideration by the reviewing court." Id. at 157. "Furthermore," the Court held, "because the reviewing court did not find the evidence legally insufficient to justify imposition of the death penalty, there was no death penalty 'acquittal' by that court," and thus "[t]he Double Jeopardy Clause . . . did not foreclose a second sentencing hearing at which the 'clean slate' rule applied." Id.

44

The most recent Supreme Court decision relevant to Selsor's double jeopardy claim is <u>Sattazahn v. Pennsylvania</u>, 537 U.S. 101 (2003). The petitioner in <u>Sattazahn</u> was convicted in a Pennsylvania state court of various crimes, including first degree murder. At the penalty phase of the trial, the prosecution "presented evidence of one statutory aggravating circumstance: commission of the murder while in the perpetration of a felony," and the petitioner presented evidence of two mitigating circumstances. <u>Id.</u> at 104. At the close of the evidence, "the jury deliberated for some 3½ hours" before sending a note to the trial court stating they were "hopelessly deadlocked at 9-3 for life imprisonment." <u>Id.</u> "The trial judge, in accordance with Pennsylvania law, discharged the jury as hung, and indicated that he would enter the required life sentence, which he later did." <u>Id.</u> at 104-05 (internal citations omitted). On direct appeal, the Pennsylvania Superior Court concluded that the jury instructions were erroneous and "reversed petitioner's first-degree murder conviction and remanded for a new trial." <u>Id.</u> at 105. On remand, the prosecution filed a notice of intent to seek the death penalty, alleging the same aggravating circumstance it had attempted to prove at the first trial, but also "a second aggravating circumstance, petitioner's significant history of felony convictions involving the use or threat of violence to the person." <u>Id.</u> "At the second trial, the jury again convicted petitioner of first-degree murder, but this time imposed a sentence of death." <u>Id.</u> On direct appeal, the Pennsylvania Supreme Court "concluded that neither the Double Jeopardy

45

Clause nor the Due Process Clause barred Pennsylvania from seeking the death penalty at petitioner's retrial." Id.

The United States Supreme Court granted certiorari to "consider once again the applicability of the Fifth Amendment's Double Jeopardy Clause in the context of capital-sentencing proceedings." Id. at 103. Although the Court's precedent established that "'a retrial following a "hung jury" does not violate the Double Jeopardy Clause,'" id. at 109 (quoting Richardson v. United States, 468 U.S. 317, 324 (1984)), the petitioner argued "that given the unique treatment afforded capital-sentencing proceedings under Bullington, double-jeopardy protections were triggered when the jury deadlocked at his first sentencing proceeding and the court prescribed a sentence of life imprisonment pursuant to Pennsylvania state law," id. The Supreme Court rejected petitioner's argument. "Under the Bullington line of cases," the Court explained, "the touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal.'" Id. And, the Court further explained, neither the jury's deadlock nor the trial court's subsequent entry of a life sentence constituted an acquittal because there were no factual findings sufficient to establish petitioner's legal entitlement to a life sentence. Id.

*b) OCCA's resolution of the issue*

In Turnbull, the OCCA sua sponte "anticipated and resolved" the double jeopardy argument that Selsor now asserts. Selsor II, 2 P.3d at 349. Specifically,

46

the OCCA stated:

> [I]f a defendant has not been acquitted of the death penalty and his conviction and sentence are reversed on appeal or collateral proceedings, the slate is wiped clean and a defendant may be subjected to any punishment authorized by law, including death.

Turnbull, 947 P.2d at 583 (citing Salazar v. State, 919 P.2d 1120, 1127 (Okla. Crim. App. 1996)).

Selsor asked the OCCA to revisit the issue on direct appeal following his retrial. Selsor argued that his "case present[ed] the unique question of whether an appellate court's modification of a death sentence on appeal to life imprisonment on the grounds that the statute under which the defendant was sentenced was subsequently declared unconstitutional constitutes an implied acquittal of the death penalty." State Aplt. Br. at 38. Selsor in turn argued "that under the Supreme Court's jurisprudence," specifically Bullington, Rumsey, and Poland, the OCCA's decision in Selsor I "to modify [his] death sentence to life imprisonment constituted an 'implied acquittal' on the merits of the central issue in the proceeding: whether death was the appropriate punishment for the offense." Id.

The OCCA summarily rejected the claim, concluding that the argument was "adequately resolved in . . . Turnbull," and that "nothing in [Selsor's new appellate] brief [wa]s convincing or persuasive enough to change th[at] result[]." Selsor II, 2 P.3d at 350.

    *c) § 2254(d) analysis*

47

Underlying the OCCA's rejection of Selsor's double jeopardy claim was the implicit conclusion that the OCCA had not, in modifying Selsor's death sentence to life imprisonment in Selsor I, "acquitted" Selsor of the death penalty. As discussed in greater detail below, this conclusion was neither contrary to, nor an unreasonable application of, clearly established federal law.

On direct appeal from his first trial, Selsor argued that he was sentenced under an unconstitutional death penalty statute (i.e., Oklahoma's 1973 death penalty statute). The OCCA agreed with Selsor, summarily stating:

> In his first assignment of error, defendant asserts the unconstitutionality of Oklahoma's death penalty statute, 21 O.S. Supp. 1973, § 701.3. With this we agree. See Riggs v. Branch (State), Okl.Cr., 554 P.2d 823 (1976).

Selsor I, 562 P.2d at 927. At the conclusion of its decision, the OCCA then stated, in pertinent part:

> For the foregoing reasons, the sentence in Case No. CRF-75-2181, Murder in the First Degree, is hereby MODIFIED to Life imprisonment, and otherwise AFFIRMED . . . .

Id. at 931.

The conclusory nature of the OCCA's reasoning in Selsor I, combined with its citation to Riggs, makes it necessary to examine Riggs in some detail. As previously noted, Riggs was decided in the immediate wake of the Supreme Court's rejection of post-Furman, mandatory death penalty schemes adopted by a number of states, including Oklahoma. The OCCA acknowledged these Supreme

48

Court decisions at the outset of Riggs and in turn concluded that its task was "to determine the status of . . . those defendants[, like Selsor,] convicted of [First Degree Murder] prior to the effective date of [Oklahoma's] new [1976] murder statute[]." Riggs, 554 P.2d at 825. In resolving this question, the OCCA concluded that "the death penalty as provided in [the 1973 first degree murder statute] ha[d] been effectively stricken from [the] statute," id. at 827, but that "a constitutionally permissible penalty remain[ed]" for those defendants convicted of first degree murder under the 1973 statute, id. at 828. Specifically, the OCCA noted that although the 1973 murder statute mandated a sentence of death for anyone convicted of first degree murder, it also authorized the OCCA to modify a sentence of death to life imprisonment based upon "errors of law occurring at trial" or because "the death penalty was discriminatorily or disproportionately imposed." Id. (internal quotations omitted; citing Okla. Stat. tit. 21, § 701.5 (1973)). Finally, exercising that modification power, the OCCA concluded "that the appropriate penalty for murder in the first degree . . . under the 1973 statute" was life imprisonment. Id. at 829. Thus, in sum, the OCCA effectively modified, on the basis of constitutional error, all death sentences imposed on defendants convicted of first degree murder under Oklahoma's 1973 murder statute.

Returning to Selsor I, it is apparent that the OCCA, by applying its decision in Riggs to modify Selsor's death sentence to a term of life imprisonment, did not, as Selsor now suggests, "acquit" him of the death sentence. See Aplt. Br. at

49

50 (suggesting that Selsor I amounted to a determination "'that the prosecution ha[d] not proven its case that the death penalty [wa]s appropriate.'" (quoting Poland, 476 U.S. at 155)). Indeed, the OCCA's decision could not have amounted to such an acquittal because the prosecution in Selsor's original trial was never required, and thus did not attempt, to prove that Selsor should be sentenced to death. Rather, Oklahoma's 1973 murder statute mandated the imposition of the death penalty for any defendant convicted of first degree murder. And it was the mandatory nature of the death penalty and the consequential Eighth Amendment violation that prompted the OCCA to modify Selsor's sentence to life imprisonment. Thus, there was never any determination by the OCCA that the prosecution failed to prove its case for the death penalty to be imposed against Selsor.

We thus conclude that Selsor is not entitled to federal habeas relief on the basis of his double jeopardy claim.

*3. Ex post facto/due process violation*

In Proposition Three of his appellate brief, Selsor contends that at his 1998 retrial he was effectively prosecuted and convicted under Oklahoma's 1976 murder statute, rather than the 1973 murder statute he was charged with violating, and that, as a result, his first degree murder conviction violates the Ex Post Facto Clause. In support, Selsor notes that in Turnbull the OCCA "proclaimed that [he] was now 'similarly situated to defendants awaiting trial under current murder and

50

death penalty statutes.'" Aplt. Br. at 55 (quoting Turnbull, 947 P.2d at 583).

Selsor contends that "[t]he prosecutor, defense counsel, and the trial court

apparently took that pronouncement at face value, and conducted [his] trial under

the 1976 murder statute, including its changed definition of first-degree murder."

Id. However, Selsor notes, when he argued on direct appeal from his second trial

"that this violated his rights under the Ex Post Facto Clause, the OCCA once

again changed its tune," id., and held that "Selsor was not tried under the 1976

law," id. at 56. "In so ruling," Selsor argues, "the OCCA unreasonably

determined the factual question of whether [he] was tried under the 1976 murder

statute . . . ." Id. Consequently, he argues, "this Court should review [his] ex

post facto claim de novo and grant him the writ as to his unconstitutional

conviction." Id.

> *a) Clearly established federal law*

Although Selsor frames the alleged error as an ex post facto violation, we

believe the alleged error is more appropriately treated as a due process violation.

"The Ex Post Facto Clause, by its own terms, does not apply to courts." Rogers,

532 U.S. at 460. Instead, "[t]he Ex Post Facto Clause is a limitation upon the

powers of the Legislature . . . ." Marks v. United States, 430 U.S. 188, 191

(1977). In this case, there is no assertion that the alleged error resulted from a

51

legislative act[8]; instead, Selsor's claim hinges on the assertion that the state trial court erroneously instructed the jury as to the elements of the 1976 murder statute, rather than the elements of the 1973 murder statute Selsor was charged with violating.

The Supreme Court has "observed . . . that limitations on ex post facto judicial decisionmaking are inherent in the notion of due process." Rogers, 532 U.S. at 456. In other words, a judicial decision that has an ex post facto effect can give rise to "a valid due process claim." United States v. Marcus, 130 S. Ct. 2159, 2165 (2010) (citing Bouie, 378 U.S. at 353-54). The Supreme Court has cautioned, however, that the Due Process Clause does not, depending upon the context of the judicial decision at issue, necessarily incorporate all of the specific prohibitions of the Ex Post Facto Clause. Rogers, 532 U.S. at 458-60.

*b) Facts relevant to claim*

Selsor was originally charged by information with first degree murder in violation of Oklahoma's 1973 murder statute. See Okla. Stat. tit. 21, § 701.1 (1973). That statute defined the crime of first degree murder to require proof of "a premeditated design to effect the death of the person killed, or of any other human being," and commission of the murder during the course of one of several

---

[8] There is no indication that the Oklahoma legislature intended for the 1976 murder statute to be applied retroactively to criminal defendants, such as Selsor, who committed their crimes prior to its enactment, and respondents do not argue otherwise.

enumerated felony offenses, including armed robbery. Id. Consistent with that statutory definition, the information filed against Selsor alleged that he, "with a premeditated design to effect the death of one CLAYTON CHANDLER," and "while being then and there engaged in committing the crime of Robbery With Firearms did kill the said CLAYTON CHANDLER by means of a firearm loaded with powder . . . ." S. R., Vol. I at 10.

At Selsor's retrial proceedings, the prosecution relied on the original information. However, the prosecution also filed a Bill of Particulars (something it was not required to do under the 1973 murder statute) alleging the existence of two aggravating circumstances enumerated in Oklahoma's 1976 murder statute. See Okla. Stat. tit. 21, §701.12 (1976). Selsor moved to strike the Bill of Particulars. After the state trial court denied Selsor's motion, Selsor petitioned the OCCA for a writ of mandamus and asserted a number of constitutional objections to the Bill of Particulars.

The OCCA, in its Turnbull decision, rejected Selsor's petition. In rejecting Selsor's claim that the prosecution's pursuit of the death penalty against him violated his rights under the Equal Protection Clause, the OCCA stated that Selsor "[wa]s no longer similarly situated to those defendants subject to Oklahoma's unconstitutional death penalty statute, 21 O.S.Supp.1973, § 701.3, or to those defendants whose sentences were modified in accordance with Riggs." Turnbull, 947 P.2d at 583. Selsor's "Judgment and Sentence has been vacated," the OCCA

53

stated, "<u>and he stands before this Court, similarly situated to defendants awaiting trial under current murder and death penalty statutes</u>."[9]  <u>Id.</u> (emphasis added).

Following the issuance of <u>Turnbull</u>, Selsor's case returned to the state trial court, where his retrial proceedings began.  At the close of the first-stage evidence, the state trial court read to the jury the language of the information that was filed against Selsor in 1975.  S. R., Vol. III at 351-54.  That language stated, in pertinent part:

> The Defendant in this case, MICHAEL B. SELSOR, stands charged by an Information filed by the State of Oklahoma with the crime of MURDER IN THE FIRST DEGREE.
>
> The Information alleges that RICHARD EUGENE DODSON and MICHAEL B. SELSOR, on or about the 15th day of September, 1975, in Tulsa County, State of Oklahoma, and within the jurisdiction of this Court, did unlawfully, feloniously, and willfully, while acting in concert each with the other, without authority of law, and with a premeditated design to effect the death of one CLAYTON CHANDLER, the said RICHARD EUGENE DODSON and the said MICHAEL B. SELSOR did, while being then and there engaged in committing the crime of Robbery with firearms, did kill the said CLAYTON CHANDLER by means of a firearm loaded with powder and shot, held in the hands of the said defendants and with which they pointed at, fired, and shot the said CLAYTON CHANDLER, said shot causing mortal wounds in the body of the said CLAYTON CHANDLER, from which mortal wounds the said CLAYTON CHANDLER did languish and die;

---

[9] Although Selsor now suggests that these statements amounted to a factual determination by the OCCA that he was being tried under Oklahoma's 1976 murder statute, we disagree.  In our view, the OCCA was simply explaining that Selsor was "similarly situated" to defendants being tried under the 1976 murder statute in that he was awaiting retrial, with no existing conviction or sentence in place.

* * *

    The Defendant in this case, MICHAEL B. SELSOR, stands charged by an Information filed by the State of Oklahoma with the crime of ROBBERY WITH FIREARMS.

    The Information alleges that RICHARD EUGENE DODSON and MICHAEL B. SELSOR, on or about the 15th day of September, 1975, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did unlawfully, feloniously and wrongfully, while acting in concert each with the other, rob one CLAYTON CHANDLER, by wrongfully taking and carrying away certain money belonging to U-TOTE-M STORE #918, and in the possession of said CLAYTON CHANDLER, and in his immediate presence, without his consent and against his will, said robbery being accomplished by said defendants with the use of a certain firearm, to-wit: a .22 caliber pistol, and which they used to menace and threaten the said CLAYTON CHANDLER with harm if he resisted, and by said assault, threats and menace did then and there put the said CLAYTON CHANDLER in fear of immediate and unlawful injury to his person and overcame all his resistance, and while so intimidating him did then and there wrongfully take and obtain from him the money aforesaid, contrary to the form of the Statutes in such cases made and provided, and against the peace and dignity of the State.

Id. at 351-54.

The state trial court then proceeded to provide the jury with specific instructions regarding the crime of first degree murder. In doing so, the state trial court outlined for the jury the essential elements of first degree murder under Oklahoma's 1976 murder statute, rather than the 1973 murder statute under which Selsor was charged:

    The defendant is charged with:
    MURDER IN THE FIRST DEGREE of CLAYTON CHANDLER on September 15, 1975, in Tulsa County, Oklahoma.

55

Id. at 361.

> No person may be convicted of murder in the first degree unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:
> First, the death of a human;
> Second, the death was unlawful;
> Third, the death was caused by the defendant;
> Fourth, the death was caused with malice aforethought.

Id. at 363.

The state trial court also separately instructed the jury on the elements of

the crime of Robbery With Firearms:

> The defendant is charged with:
> ROBBERY WITH FIREARMS of CLAYTON CHANDLER on September 15th, 1975, in Tulsa County, Oklahoma.

Id. at 371.

> No person may be convicted of ROBBERY WITH FIREARMS unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:
>
> First, wrongful;
> Second, taking;
> Third, carrying away;
> Fourth, personal property;
> Fifth, of another;
> Sixth, from the person of another;
> Seventh, by force/fear;
> Eighth, through use of a loaded firearm.

Id. at 372. After deliberating, the jury found Selsor guilty of both of these

crimes, as well as the crime of Shooting With Intent to Kill.

   *c) OCCA's rejection of the claim*

On direct appeal to the OCCA from his retrial, Selsor argued, in pertinent part, that the state trial court's retroactive application of the 1976 first degree murder statute and its corresponding penalty provisions violated the prohibition against ex post facto laws. The OCCA rejected that argument, stating as follows:

In Proposition I, Selsor argues that the ex post facto provisions of the federal and state constitutions were violated because he was tried in 1998 pursuant to the First Degree Murder statute (21 O.S.1991, § 701.7(A)) in effect then rather than the statute in effect when he allegedly committed the crime (21 O.S.Supp.1973, § 701). In Proposition V, he asserts that his jury was mis-instructed on the applicable elements of First Degree Murder and that the Information did not adequately notify him of the charges against which he had to defend. We address these propositions together and conclude that they both lack merit.

This Court focuses on the following factors when determining whether there has been an ex post facto violation: i, the elements of the offense; ii, the conditions and quantum of punishment; and iii, the quantity and degree of proof necessary to establish guilt. Although the elements of First Degree Murder and the burden of proof contained in the 1973 statute (under which Selsor was charged) differ from those contained in the current statute, Selsor's jury was instructed on all the elements of First Degree Murder under the 1973 statute.

While all elements of First Degree Murder under the 1973 statute were not contained within Instruction 9, they were included within the instructions as a whole. Instruction 18 correctly informs the jury on the elements of Robbery with Firearms. The essential elements of that offense are the same under the statute applicable at the time of Selsor's crime ( 21 O.S.1971, § 801) and the current statute ( 21 O.S.1991, § 801). Thus, considering Instructions 9 and 18 together indicates that Selsor's jury was instructed upon and found him guilty of all the elements of First Degree Murder under the applicable 1973 statute. As such, the defendant was not convicted under a lesser burden of proof, and under these circumstances, we do not find a violation of the ex post facto provisions of the State and Federal

57

constitutions.

Selsor II, 2 P.3d at 350 (internal paragraph numbers and footnotes omitted).

*d) § 2254(d) analysis*

The OCCA correctly noted that the state trial court's first degree murder instruction (Instruction 9) failed to include all of the essential elements under the 1973 murder statute. But rather than considering whether this resulted in constitutional error, the OCCA instead looked to the remainder of the state trial court's jury instructions and concluded that, because Instruction 18 correctly informed the jury of the elements of Robbery with Firearms, the instructions as a whole encompassed all of the essential elements of the 1973 murder statute. In turn, the OCCA concluded that no constitutional error occurred.

This reasoning is backwards. While the presence of Instruction 18 may be relevant to the question of harmlessness, it does nothing to alter the fact that Selsor was convicted of first degree murder under the elements of the 1976 murder statute. As we have noted, Oklahoma's 1976 murder statute, in contrast to Oklahoma's 1973 murder statute, allowed the State to convict a defendant of first degree murder on the basis of malice aforethought alone, without proving that the killing occurred during the commission of one of several statutorily designated felony offenses. And because the 1976 murder statute required fewer elements of proof than the 1973 murder statute, the state trial court's instructional error clearly had an ex post facto effect on Selsor. Specifically, Selsor was

58

effectively subjected to a law "that aggravate[d] a crime, or ma[d]e[] it greater than it was, when committed." Calder, 3 U.S. (3 Dall.) at 390 (emphasis in original). Consequently, we conclude the OCCA unreasonably determined that no constitutional error resulted from the state trial court's first degree murder instructions.

Having concluded that the state trial court's instructions effectively violated Selsor's due process rights, and that the OCCA's resolution of this issue was contrary to, or an unreasonable application of, clearly established federal law, two related questions remain: whether the error is subject to harmless error review and, if so, "whether the error was harmless." Patton v. Mullin, 425 F.3d 788, 819 (10th Cir. 2005). Although Selsor correctly notes that the Supreme Court has never addressed whether ex post facto violations are subject to harmless error review, the constitutional violation that occurred here is not, as we have already explained, an ex post facto violation. Rather, it is a due process violation with an ex post facto effect. And on that point, the Supreme Court has recently and clearly spoken.

In Marcus, a criminal defendant was indicted on charges that he engaged in unlawful conduct between January 1999 and October 2001. At trial, the government presented evidence of the defendant's conduct during that entire period, and the jury convicted him. On appeal, the defendant argued that because the statutes he was convicted of violating did not become law until October 28,

59

2000, there was an Ex Post Facto Clause violation, and that the violation was a structural error that warranted reversal without a showing of prejudice. The Supreme Court, however, rejected those arguments. The Court first held, citing its decision in Marks, that it was "incorrect to classify the error at issue as an Ex Post Facto Clause violation . . . ." Marcus, 130 S. Ct. at 2165. Instead, the Court held, "if the jury . . . convicted [the defendant] based exclusively on noncriminal, preenactment conduct, [the defendant] would have a valid due process claim." Id. (citing Bouie, 378 U.S. at 353-54). The Court in turn rejected the notion that such a due process violation was a structural error. Id. ("We see no reason why, when a judge fails to give an instruction, a reviewing court would find it any more difficult to assess the likely consequences of that failure than with numerous other kinds of instructional errors that we have previously held to be non-'structural' . . . .").

In light of Marcus, we conclude that the due process violation that resulted from the state trial court's instructional error is amenable to harmless error review. And "[b]ecause the OCCA did not reach th[e] issue, it is reviewed by this court under the harmless error standard announced in Brecht v. Abrahamson, 507 U.S. 619, 637-38, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)." Marcus, 130 S. Ct. at 2165; see Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard governs in federal habeas cases regardless of whether state courts recognized the error and applied any harmless error review). Under Brecht, "the

60

standard for determining whether habeas relief must be granted is whether the . . . error [at issue] 'had substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. at 623 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, did the constitutional error at issue "result[] in 'actual prejudice'"? Id. at 637.

We have little trouble concluding that the state trial court's instructional error did not have a substantial and injurious effect on the jury's guilt phase verdict. To be sure, the instructional error, as we have already discussed, allowed the jury to convict Selsor of first degree murder on the basis of fewer essential elements than were required for conviction under the applicable 1973 murder statute. But the presence of Instruction 18, which correctly outlined for the jury the elements of Robbery with Firearms, combined with the jury's findings of guilt on the First Degree Murder and Robbery with Firearms charges, meant that the jury found the existence of all but one of the essential elements of the 1973 murder statute. And the only essential element that was not covered by the state trial court's instructions, i.e., that the murder occurred "while in the commission" of the robbery, was essentially undisputed. In other words, the prosecution's evidence clearly established, without dispute from Selsor, that Selsor murdered Chandler during the course of the convenience store robbery. In short, then, the instructional error resulted in no "actual prejudice" at the guilt phase of Selsor's

trial.[10]

We must still address, however, whether the state trial court's instructional error had a substantial and injurious effect on the jury's penalty phase verdict. Selsor argues that the error had precisely such an effect because it "led to the jury's consideration and finding of an invalid aggravating factor . . . ." Aplt. Br. at 69. In support, Selsor notes that the jury at the penalty phase "was instructed that it could find the 'avoid arrest or prosecution' aggravator only if it determined that Selsor killed Chandler to avoid arrest for 'another crime separate and distinct from the murder.'" Id. (quoting S. R., Vol. III at 403; emphasis in original). This instruction, Selsor argues, "was consistent with the OCCA's decisions holding that the 'avoid arrest or prosecution' aggravator required proof of 'a predicate offense, separate from the murder, for which the defendant seeks to avoid arrest or prosecution,'" id. at 69-70 (quoting Scott v. State, 891 P.2d 1283, 1294 (Okla. Crim. App. 1995)), and "was also consistent with the guilt phase instructions [his] jury received . . . explaining that the murder and robbery were separate offenses, each of which 'must stand on its own merits,'" id. at 70 (quoting S. R., Vol. III at 360). Had the jury been properly instructed on the 1973 murder statute, Selsor

_____

[10] Selsor does not argue that the state trial court's instructional error resulted in actual prejudice at the guilt phase of his trial. Instead, he argues that "the ex post facto violation render[ed] [his] conviction legally void . . . ." Aplt. Br. at 68. As we have explained, however, the state trial court's error did not result in an ex post facto violation, but rather a due process violation that is amenable to harmless error review.

argues, "the jury could not have found the aggravator" because, "[u]nder the 1973 law, the robbery was an essential element of" first degree murder "and thus could not serve as a predicate for the 'avoid arrest or prosecution' aggravator." Id. In turn, Selsor argues, the jury "thus would have found only the 'risk of death to more than one person' aggravator," and "[t]he . . . finding of only a single aggravator likely would have shifted the balance in favor of a life sentence." Id. at 71. Thus, Selsor asserts, the district court's instructional error "had a substantial and injurious effect on the jury's death verdict . . . ." Id.

We disagree. To be sure, the OCCA's decisions provide that establishment of the "avoid arrest or prosecution" aggravator requires proof that "the defendant committed some 'predicate crime,' separate from the murder." Mitchell v. State, 136 P.3d 671, 677 (Okla. Crim. App. 2006) (citing cases from the mid-1990's). But what Selsor overlooks is that the OCCA's decisions also provide that "in cases in which the capital defendant is charged with first-degree felony murder, the crime that serves as the underlying felony for the murder conviction can also serve as the predicate crime for the avoid arrest aggravator in the second stage." Id. at 678 (citing prior cases from 1994, 2000, and 2004). Thus, even though the prosecution in Selsor's case had to prove commission of the robbery in order to convict Selsor of first degree murder under the 1973 murder statute, the robbery could still properly serve as the predicate crime for the avoid arrest aggravator. Accordingly, the state trial court's instructional error did not invalidate the avoid

63

arrest aggravator, and in turn did not have a substantial and injurious effect on the jury's second-stage findings.

4. *Equal protection - imposition of death penalty for pre-1976 murder*

In Proposition Four of his appellate brief, Selsor contends that "[b]y resentencing [him] to death, both the State and the OCCA have deprived him of equal protection of the laws, in violation of the Fourteenth Amendment." Aplt. Br. at 72. More specifically, Selsor contends that "[t]he State treated [him] differently from all other defendants convicted of murders occurring between May 17, 1973 and July 24, 1976, by obtaining a death sentence against him alone." Id.

*a) Clearly established federal law applicable to the claim*

Selsor points to a number of Supreme Court decisions in support of his equal protection claim. To begin with, Selsor cites to City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985), for the general proposition that "[t]he Equal Protection Clause of the Fourteenth Amendment . . . is essentially a direction that all persons similarly situated should be treated alike." Selsor also notes that in Jones v. Helms, 452 U.S. 412, 423-24 (1981), the Supreme Court held that "[t]he Equal Protection Clause provides a basis . . . for contending that general rules are being applied in an arbitrary or discriminatory way." In turn, Selsor notes that the State typically must establish "a rational basis for [a] difference in treatment," Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000), meaning that "the classification itself [must be] rationally related to a

legitimate governmental interest," <u>U.S. Dep't of Agric. v. Moreno</u>, 413 U.S. 528, 533 (1973). Lastly, Selsor asserts that where, as here, the challenged government action implicates a fundamental right (in his case, he asserts, the right to life), "the government has the burden of proving that [the challenged] classifications 'are narrowly tailored measures that further compelling governmental interests.'" <u>Johnson v. California</u>, 543 U.S. 499, 505 (2005) (quoting <u>Adarand Constructors, Inc. v. Peña</u>, 515 U.S. 200, 227 (1995)).

*b) The OCCA's resolution of the claim*

Selsor presented his equal protection claim to the OCCA in the context of the mandamus action he filed in 1997 seeking to challenge the state trial court's denial of his motion to dismiss the prosecution's Bill of Particulars. The OCCA rejected the claim, concluding as follows:

> Petitioner's equal protection claim can be easily and summarily disposed of. Petitioner is simply no longer similarly situated to those defendants subject to Oklahoma's unconstitutional death penalty statute, 21 O.S.Supp.1973, § 701.3, or to those defendants whose sentences were modified in accordance with <u>Riggs</u>. Petitioner's Judgment and Sentence has been vacated and he stands before this Court, similarly situated to defendants awaiting trial under current murder and death penalty statutes. <u>Dobbert</u>, 432 U.S. at 301, 97 S.Ct. at 2302, 53 L.Ed.2d at 361; <u>see</u> <u>also</u> <u>Cheatham v. State</u>, 900 P.2d 414, 428-30 (Okl.Cr.1995).

<u>Turnbull</u>, 947 P.2d at 583.

*c) § 2254(d) analysis*

According to Selsor, the relevant comparison group for purposes of his

65

equal protection claim includes all Oklahoma state defendants convicted of murders occurring between May 17, 1973 and July 24, 1976. In so defining this comparison group, Selsor obviously "regards . . . as immaterial to the similarly-situated analysis," United States v. Moore, 543 F.3d 891, 897 (7th Cir. 2008), the fact that he, unlike every other member of that group, obtained federal habeas relief, had his original convictions and sentences invalidated, and was afforded a new trial, Kaiser II, 81 F.3d at 1506.

In our view, however, the OCCA's more narrow construction of the "similarly situated" test, and its related conclusion that Selsor was not similarly situated to the identified group because of his successful federal habeas action and subsequent retrial, was an entirely reasonable construction of clearly established federal law. Although the Supreme Court, as far as we can determine, has never precisely defined the meaning of "similarly situated," it has emphasized that the comparative group identified by the plaintiff/petitioner must be "similarly situated in relevant respects." Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 366 n.4 (2001). This court, in turn, has attempted to provide a somewhat more detailed definition, noting that "the degree to which others are viewed as similarly situated [for equal protection analysis purposes] depends substantially on the facts and context of the case," and that, consequently, many "legitimate" "variables" may serve to distinguish the plaintiff from those other persons. Jennings v. Stillwater, 383 F.3d 1199, 1213-14 (10th Cir. 2004). Other circuits

66

have held that the comparison group identified by the party asserting an equal protection claim must be "identical in all relevant respects." Srail v. Village of Lisle, 588 F.3d 940, 945 (7th Cir. 2009) (internal quotation marks omitted). Together, these principles clearly support the OCCA's conclusion that Selsor was not, because of having obtained federal habeas relief and received a new trial, "similarly situated" to his identified comparison group. Thus, we conclude Selsor is not entitled to federal habeas relief on the basis of his equal protection claim.

 5.  *Vindictive prosecution - due process violation*

In Proposition Five of his appellate brief, Selsor contends that the State violated his due process rights when, following his successful federal habeas action, it actively sought the death penalty against him. Selsor contends that the State's action in this regard raises an "unrebuttable presumption" of vindictive prosecution. Aplt. Br. at 77.

 *a) Clearly established federal law applicable to the claim*

In support, Selsor points to Blackledge v. Perry, 417 U.S. 21 (1974), and subsequent Supreme Court "decisions construing that case." Aplt. Br. at 80. According to Selsor, "[t]hat body of law holds that where, as here, an appellate court reverses a defendant's conviction, and the State, on retrial, seeks a more severe sentence than it sought before the reversal, a presumption of vindictive prosecution arises that mandates invalidation of the more severe sentence, unless the State produces objective proof rebutting the presumption." Id. (emphasis in

67

original).

The general principle relied on by Selsor appears to have first originated in North Carolina v. Pearce, 395 U.S. 711, 726 (1969). In Pearce, the Supreme Court addressed the following question: "When at the behest of the defendant a criminal conviction has been set aside and a new trial ordered, to what extent does the Constitution limit the imposition of a harsher sentence after conviction upon retrial?" Id. at 713. The Court first held "that neither the double jeopardy provision nor the Equal Protection Clause imposes an absolute bar to a more severe sentence upon reconviction." Id. at 723. In other words, the Court held, "[a] trial judge is not constitutionally prohibited . . . from imposing a new sentence, whether greater or less than the original sentence, in light of events subsequent to the first trial that may have thrown new light upon the defendant's 'life, health, habits, conduct, and mental and moral propensities.'" Id. (quoting Williams v. New York, 337 U.S. 241, 245 (1949)). The Court in turn held, however, that the Due Process Clause of the Fourteenth Amendment places certain limitations on the sentence that can be imposed following retrial. In particular, the Court held that "[d]ue process of law . . . requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." Id. at 725. "And," the Court further held, "since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or

68

collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motive on the part of the sentencing judge." Id. "In order to assure the absence of such a motivation," the Court held, "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear," and "[t]hose reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." Id. at 726.

In Blackledge, the Court addressed the related question of whether the Constitution places limitations on the ability of a prosecutor, following a defendant's successful appeal or habeas action, to file more serious charges against the defendant, i.e., charges that carry a more severe sentence than was originally imposed on the defendant after the first trial. In addressing this question, the Court examined Pearce and two of its own post-Pearce decisions and concluded that "[t]he lesson that emerge[d] from [them] [wa]s that the Due Process Clause is not offended by all possibilities of increased punishment upon retrial after appeal, but only by those that pose a realistic likelihood of 'vindictiveness.'" Blackledge, 417 U.S. at 27. Applying that lesson to the situation before it, the Court held that "[a] person convicted of an offense is entitled to pursue his statutory right to [appeal], without apprehension that the State will retaliate by substituting a more serious charge for the original one, thus

69

subjecting him to a significantly increased potential period of incarceration." Id. at 28.

In 1984, the Court, prompted by a "conflict among the Circuits," revisited "the meaning of [its] holding in Pearce." Wasman v. United States, 468 U.S. 559, 563 (1984). In doing so, the Court outlined the key portion of Pearce's holding:

> To prevent actual vindictiveness from entering into a decision and allay any fear on the part of a defendant that an increased sentence is in fact the product of vindictiveness, the Court fashioned what in essence is a "prophylactic rule," see Colten v. Kentucky, 407 U.S. 104, 116, 92 S.Ct. 1953, 1960, 32 L.Ed.2d 584 (1972), that "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear." 395 U.S., at 726, 89 S.Ct., at 2081. This rule has been read to "[apply] a presumption of vindictiveness, which may be overcome only by objective information in the record justifying the increased sentence." United States v. Goodwin, 457 U.S. 368, 374, 102 S.Ct. 2485, 2489, 73 L.Ed.2d 74 (1982). The rationale for requiring that "the factual data upon which the increased sentence is based" be made part of the record, of course, is that the "constitutional legitimacy," of the enhanced sentence may thereby be readily assessed on appeal. Ibid.

Id. at 564-65 (brackets in original). The Court in turn noted that Blackledge was the "only . . . other circumstance [in which it] ha[d] identified a need to indulge a presumption of vindictiveness of the kind imposed in Pearce." Id. at 565. Describing Blackledge, the Court stated:

> Although there was no affirmative evidence tendered that the prosecutor brought the [greater] felony charge in bad faith, we agreed that, because the record was devoid of any explanation for the new indictment, relief should be granted. Consistent with Pearce, however, we explicitly observed that a different disposition would have been called for had the State advanced a legitimate

70

nonvindictive justification for the greater charge. This acknowledgment, of course, was no more than a reaffirmation that Pearce established a rebuttable presumption of vindictiveness, not an absolute prohibition on enhancement of sentence.

Id. at 566. The Court proceeded to describe four cases in which it "expressly declined invitations to extend the presumption." Id. After doing so, the Court summarized the impact of Pearce, Blackledge, and the other four cases:

In sum, where the presumption applies, the sentencing authority or the prosecutor must rebut the presumption that an increased sentence or charge resulted from vindictiveness; where the presumption does not apply, the defendant must affirmatively prove actual vindictiveness.

Id. at 569.[11]

*b) The OCCA's resolution of the claim*

Selsor presented this claim to the OCCA in 1997 when, following the state trial court's denial of his motion to strike the Bill of Particulars filed by the prosecution, he petitioned the OCCA for a writ of mandamus. In his filing with the OCCA, Selsor argued, in pertinent part, that in light of Riggs, "there was no death penalty statute in effect in Oklahoma in 1975, when [he] [wa]s alleged to have committed the crime of murder in the first degree," but that he was nevertheless "facing the death penalty, a greater punishment than that in place at

---

[11] In 1989, the Court refined Pearce slightly, "hold[ing] that no presumption of vindictiveness arises when the first sentence was based upon a guilty plea, and the second sentence follows a trial." Alabama v. Smith, 490 U.S. 794, 795 (1989). That holding appears to have no impact on Selsor's case.

the time of the alleged commission of the crime, because his Sixth Amendment right to effective assistance of counsel was violated" and ultimately vindicated in a federal habeas proceeding. App. to Assume Original Jurisdiction and Pet. for Writ of Prohibition and/or Mandamus at 6, 8-9. Exposing him to such possible punishment, Selsor argued, "fl[ew] in the face of due process." Id. at 9. Notably, Selsor did not cite to Pearce or Blackledge, nor did he argue that the prosecution acted vindictively in filing the Bill of Particulars against him.[12]

In addressing Selsor's arguments, the OCCA first held that, "[c]ontrary to [Selsor]'s arguments, there was a death penalty statute in effect in 1975, and on the date his crime was committed, in the form of 21 O.S.Supp.1973, § 701.3." Turnbull, 947 P.2d at 582. In support, the OCCA stated:

> Contrary to this Court's analysis in Riggs, the newly enacted death penalty statutes did not change the burden of proof to the detriment of Riggs and other defendants, as compared to the burden of proof under Section 701.3. Under Section 701.3, the only available sentence was death. Under newly enacted death penalty statutes, the sentencing options increased in favor of a defendant to include not only death but also the possibility of life imprisonment, and now life without parole. 21 O.S.Supp.1976, §§ 701.9 and 701.10; 21 O.S.1991, § 701.9, and Supp.1996, § 701.10. Under Section 701.3, the State was only required to prove the elements of the crime of First Degree Murder. Once those elements were proven, the State had no further burden of proof because the death penalty was required. Under newly enacted death penalty statutes, the State not only must prove the same elements of the crime of First Degree

---

[12] Despite Selsor's failings, we conclude that the claim he asserted before the OCCA was "the substantial equivalent" of the claim he now asserts in this federal habeas proceeding. Picard v. Connor, 404 U.S. 270, 278 (1971).

72

Murder, but also must prove aggravating circumstances before the death penalty can be imposed. Id. Therefore, newly enacted death penalty statutes (1) did not increase the elements of the offense of First Degree Murder, (2) did not increase but in fact decreased the conditions and quantum of punishment, and (3) did not decrease but in fact increased the quantity and degree of proof necessary to establish guilt, and are not ex post facto. [citations omitted] The ex post facto analysis and the holdings thereunder in Riggs v. Branch, 554 P.2d 823 (Okl.Cr.1976) are hereby overturned.

Id. at 582-83. Later in its opinion, the OCCA rejected Selsor's due process

argument:

Finally, we reject Petitioner's claim that to subject him to the death penalty, because his Sixth Amendment right to effective assistance of counsel was violated, flies in the face of due process. Petitioner has not supported this claim with citation to any authority. Rule 3.5(C)(4), *Rules*[ *of the Court of Criminal Appeals*]. Moreover, if a defendant has not been acquitted of the death penalty and his conviction and sentence are reversed on appeal or collateral proceedings, the slate is wiped clean and a defendant may be subjected to any punishment authorized by law, including death. Salazar v. State, 919 P.2d 1120, 1127 (Okl.Cr.1996). Finally, subjecting Petitioner to the death penalty does not appear to be punishment for Petitioner's successful attack on his Judgment and Sentence, but merely an application of the correct law, and/or a correction of the applicable law. See Stafford v. State, 800 P.2d 738, 740 (Okl.Cr.1990).

Id. at 583. Both the Salazar and Stafford decisions cited by the OCCA expressly

cited to Pearce and its progeny. Salazar, 919 P.2d at 1127 n.8; Stafford, 800 P.2d

at 740.

*c) § 2254(d) analysis*

Selsor contends the OCCA's decision "directly conflicts with" Blackledge

and the Supreme Court's "later decisions construing that case." Aplt. Br. at 80.

73

According to Selsor, "[t]he OCCA ruled contrary to this clearly established law, because in resting its decision on the perceived absence of evidence of retaliation, it failed to recognize that vindictiveness must be presumed, and that the State bore the burden of rebutting that presumption." Id.

It is apparent from its decision that the OCCA did not expressly address the question of whether Selsor was, under Pearce and its progeny, entitled to a presumption of vindictiveness, or whether Selsor was instead required to prove actual vindictiveness on the part of the prosecution. As the Supreme Court recently emphasized, however, it is unnecessary that a state court "explain[] [its] reasoning." Harrington v. Richter, 131 S. Ct. 770, 784 (2011). Thus, we must assume, in applying the standards outlined in § 2254(d), that the OCCA concluded Selsor was not entitled to a presumption of vindictiveness and that, in turn, Selsor failed to prove actual vindictiveness.

Neither of these implicit conclusions reached by the OCCA are contrary to, or an unreasonable application of, Pearce or its progeny. Turning first to the question of whether Selsor was entitled to a presumption of vindictiveness, the relevant comparison, according to the Supreme Court, is between the "original sentence" and the "new" or newly-sought sentence. Pearce, 395 U.S. at 723; Blackledge, 417 U.S. at 27-28. In Selsor's case, we conclude that the "original sentence" was the death sentence imposed by the state trial court pursuant to the jury's verdict, and not, as suggested by Selsor, the modified sentence of life

74

imprisonment that was ordered by the OCCA on direct appeal in Selsor I. To be sure, neither Pearce nor its progeny dealt with a situation identical to the one at issue here. However, under the standard of review set forth in § 2254(d)(1), Selsor cannot obtain federal habeas relief unless we determine that the OCCA unreasonably construed Pearce and its progeny to require comparison of the "original" sentence to the sentence ultimately sought by the prosecution on retrial. And on that question, Selsor cannot prevail. In other words, because Selsor's situation differed in a key respect from the circumstances in Pearce and its progeny, the OCCA was left to determine whether to define Selsor's "original sentence" as the death sentence imposed at his original trial, or the modified life sentence imposed on direct appeal. Nothing in Pearce or its progeny indicates that the OCCA acted unreasonably in treating Selsor's death sentence as his "original sentence." Thus, in turn, the OCCA's refusal to apply a presumption of vindictiveness was not violative of § 2254(d)(1).

That leaves only the OCCA's implicit conclusion that Selsor failed to prove actual vindictiveness on the part of the prosecution in filing the Bill of Particulars and seeking the death penalty on retrial. In this federal habeas action, Selsor asserts a host of arguments in an attempt to prove actual vindictiveness: the fact that in his first direct appeal "the State asked the OCCA to modify [his] sentence to life," Aplt. Br. at 82; "[t]he extraordinary lengths to which the State went in seeking the death penalty following [his] habeas victory," including "its

75

aggressive and surprising campaign to overrule <u>Riggs</u>," <u>id.</u> at 83; "[t]he State's pursuit of an excessive sentence on the shooting with intent to kill conviction," i.e., "ask[ing] the jury for a sentence 250 times greater than it had requested at the first trial," <u>id.</u> at 84; and the lack "of any explanation by the State for its decision to seek the death penalty," <u>id.</u> at 86. The problem, however, is that Selsor made no mention of any of these factors (or of <u>Pearce</u> or its progeny) when he presented his due process claim to the OCCA. Thus, the OCCA's implicit conclusion that Selsor failed to carry his burden of presenting sufficient evidence to justify a remand to the state trial court for determination of the actual vindictiveness issue, or, alternatively, its implicit finding of no actual vindictiveness, was entirely reasonable. <u>See</u> 28 U.S.C. § 2254(d)(1) and (2).

### 6. *Prosecutorial misconduct*

In Proposition Six of his appellate brief, Selsor contends that the penalty-phase of his trial was rendered "fundamentally unfair" by prosecutorial misconduct. Aplt. Br. at 87. Specifically, Selsor contends that the prosecution, "[b]oth by suggesting, absent a shred of evidentiary support, that [his] mitigation witnesses were testifying untruthfully out of fear of reprisals, and by comparing the value of [his] life in prison to the victim's death, . . . created a grave risk that the jury's death verdict was based on passion and prejudice, rather than a reasoned review of the evidence." <u>Id.</u>

### *a) Relevant background facts*

76

Selsor's penalty-phase mitigation evidence was comprised of testimony from five non-familial witnesses. The first of those, LaDonna Penny, a data entry clerk for the Tulsa County Sheriff's Department, testified that Selsor received no write-ups during the nineteen months he was confined in the Tulsa County Jail. The remaining four witnesses, Kenneth Williamson, Bervin Knott, Fred Cook, and Linda Morgan, were either employed by, or retired from employment with, the Oklahoma Department of Corrections (ODC) and had interacted with Selsor during his imprisonment following his original conviction. All four of these witnesses testified that, despite supporting the death penalty generally, they disagreed with the prosecution's recommended sentence of death for Selsor.

In cross-examining these latter four witnesses, the prosecution focused on certain episodes of misconduct committed by Selsor during his period of confinement, in particular his attempted escape in the early 1980's. The prosecution also elicited a concession from one of the witnesses, Knott, that he would likely again be assigned to supervise Selsor if Selsor was sentenced to life in prison. Knott, however, expressly disagreed with the prosecution's suggestion on cross-examination that it could potentially place him in danger to say negative things about Selsor; indeed, Knott testified that he was not concerned about the ramifications of his testimony. Nevertheless, during its final second-stage closing argument, the prosecution argued that Knott and the other ODC witnesses were scared to say anything negative about Selsor:

77

And let's talk about the State employees, the [ODC] personnel. I would ask each and every one of you to think about their testimony in context of the evidence in this case. I would submit to you, liken it to your neighbors that you live next door to. Think about if you were asked to come in here and sit in judgment of your neighbors, and all you knew about your neighbors and whether they should receive the death penalty or not is whether they mow their yard, took out their trash, dressed okay, painted their house, and said good morning appropriately. Would you be biased? Would you know all the facts? Would you know why someone wants your neighbor killed? And think about this, ladies and gentlemen, if they're your neighbors, where are they gonna go if they don't receive a sentence of death? They're gonna come right back and they're gonna live right next door to you. Do you think those people don't know that they're rubbing elbows with this Defendant every day?

Do they know anything about Anne Chandler [(the victim's wife)] and what she's been through for the last 23 years? Do they know anything about his daughter Debbie? Do they know anything about Ina Morris? No. You've heard their testimony. They really don't know. One of them read it in the paper.

Ladies and gentlemen, we have a jury system where you all get to come in here and hear both sides. Remember, one of their witnesses was very candid. No, it's not fair to the victims to sit and make a decision if I don't know both sides. Total agreement with that. You've got to know both sides.

But you've got individuals who only knew this Defendant in a controlled prison environment for a couple of years. Some of those witnesses, are they biased? Do they have to survive in that system? You bet they do. Their word is their bond. They've worked in the same system. They've worked next to long-term offenders. How is it gonna go when they get back to the walls and all those long-term offenders hear that someone like [Selsor's] last witness, Ms. Morgan, came in here and starts saying, well, this Defendant deserves to die? How do you think that's gonna sit well with the other long-term offenders, the other killers that she works with? Do you think that could put her in jeopardy? Is it fair to those people in that position, knowing what they knew about this case? Was that fair?

78

Tr., Vol. V at 1200-02.

The prosecution also, during its final second-stage closing argument, asked the jury to consider what Selsor's life would be like if sentenced to life imprisonment, and, in doing so, contrasted that with the plight of Selsor's victims:

> Ladies and gentlemen, I submit to you, based on the evidence you've heard in this case, you've got to decide the punishment in this case. Let's think about the punishment. If you vote for a verdict other than death, what is going to be Mike Selsor's punishment? What is he going to have? He's going to have freedom, freedom to do what he wants.
>
> What have you heard about over the last 23 years? This will be your punishment. He [(Selsor)] can do what he wants. He can smoke dope, he can hang out with his friends, he can read books, watch TV, write letters, participate in rodeos, workout, play ball, work in the garden. He doesn't have to have a job. You've heard he doesn't even hold a job. He sits around and does what he wants. And all of his needs are met: clothing, food, and shelter. Is that too good for what he's done? Is that the appropriate punishment in this case? Because you do have to live with yourselves and you do have to know what you vote for is what's right.
>
> If you believe, hey, Mike [Selsor], here you go. There you go, that's what you get for what you've done, and you go back there and you vote for life without parole. If you feel that is the appropriate punishment that Mike Selsor deserves, then I submit to you, you go back there with conscience, you vote for it.
>
> But what has he done? What has been his reign of terror? Clayton Chandler lost his life, brutally, savagely, without mercy, without pity, without hesitation, without any concern for human life. He took Clayton Chandler from his family. His little girl did not get to see daddy come home that night. When she went into the door to put her arms around dad, there was no dad. He took a husband. Her dreams were in that man. Her dreams. He took the father, the pillar

79

of this society. This was a good man. He didn't do anything to deserve to die like a dog in that store. The nightmare, he created a nightmare. You bet he did. They [(the government's second-stage witnesses)] told you about it, and they lived it every single day while he's doing this.

Physical suffering. Clayton suffered. He suffered. You bet he did. The surviving family, her 29-year mate, the person she loved, her best friend, her provider, her security, her hero, he's gone. He lays right over there.

Ina Morris. It was a tragedy. That night was a tragedy. She was on her knees, asking God to forgive her for her sins. She was shot repeatedly because he [(Selsor)] made a blood pact with his partner in crime to leave no witnesses. She has suffered, she has suffered. She lost everything. She lost her innocence, she lost her trust. She couldn't even function, ladies and gentlemen. It took years and years of counseling for, what did it be [sic]? Go outside. And he deserves this.

Id. at 1202-04.

*b) Clearly established federal law applicable to the claim*

Selsor points to a trio of Supreme Court cases in support of his claim: Viereck v. United States, 318 U.S. 236 (1943), Gardner v. Florida, 430 U.S. 349 (1977), and Darden v. Wainwright, 477 U.S. 168 (1986). In Vierick, the Supreme Court condemned as prejudicial to the defendant's right to a fair trial closing remarks made by the prosecutor that were "wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice." 318 U.S. at 247. In Gardner, a capital case, the Supreme Court did not address prosecutorial misconduct, but instead held generally that "[i]t is of vital importance to the defendant [in a capital case] and to the

80

community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." 430 U.S. at 358. Finally, in Darden, another capital case, the Supreme Court characterized as "improper," but ultimately harmless, "several offensive comments" made by the prosecutor during second-stage closing arguments that "reflect[ed] an emotional reaction to the case."[13] 477 U.S. at 180. In concluding that the remarks "did not deprive [the defendant] of a fair trial," id. at 181, the Court emphasized that the prosecutor's "argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent," id. at 182.

*c) The OCCA's resolution of the claim*

Selsor first presented his claim to the OCCA on direct appeal from his 1998 retrial, arguing, in pertinent part, that the prosecutor's second-stage arguments deprived him of his right to a fair sentencing hearing. In doing so, however, Selsor failed to cite to any of the three Supreme Court cases he now relies on.

In addressing Selsor's arguments, the OCCA noted at the outset that Selsor's counsel failed to object to the purported misconduct at trial, thereby "waiving all but plain error." Selsor II, 2 P.3d at 354. The OCCA then rejected

---

[13] These included statements such as, "He [(the defendant)] shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash," and "I wish that I could see him [(the defendant)] sitting here with no face, blown away by a shotgun." 477 U.S. at 180 n.12.

81

Selsor's arguments, stating:

> Selsor . . . contends that the prosecutor demeaned his mitigation evidence by arguing facts outside the record. The prosecutor's arguments were fair challenges to Selsor's mitigating evidence. Moreover, the comments were not based upon facts outside the record but were reasonable inferences and arguments from the facts adduced at trial. There was no error.
>
> Selsor argues that the prosecutor improperly compared the advantages of Selsor's life in prison to the plight of the dead victim. These comments by the prosecutor are not error. Instead, they fairly commented on Selsor's mitigation evidence and merely asked the jury to consider what Selsor's life was like and would be like in prison based upon the evidence at trial in determining the appropriate punishment. This is proper argument.

Id. (internal paragraph numbers omitted).

*d) § 2254(d) analysis*

"[W]hen a state court applies plain error review in disposing of a federal claim, the decision is on the merits to the extent that the state court finds the claim lacks merit under federal law." Douglas v. Workman, 560 F.3d 1156, 1171 (10th Cir. 2009). That is precisely the situation here: although the OCCA applied plain error review to Selsor's claims, it ultimately concluded the claims lacked merit under controlling federal law. Consequently, the question we must address is whether the OCCA's decision was contrary to, or an unreasonable application of, the three Supreme Court decisions cited by Selsor. See id.; 28 U.S.C. § 2254(d)(1).

We conclude, contrary to Selsor's arguments on appeal, that the OCCA's

decision was consistent with <u>Viereck</u>, <u>Gardner</u>, and <u>Darden</u>.  To begin with, the challenged remarks by the prosecutor concerning the testimony of the ODC employees were not "wholly irrelevant to any facts or issues in the case," <u>Vierick</u>, 318 U.S. at 247, but rather, as noted by the OCCA, were intended to directly rebut Selsor's arguments as to why he should be sentenced to life imprisonment. Specifically, the prosecutor was attempting to argue to the jury that the testimony of the ODC employees should be discounted both because they were not privy to all of the relevant facts, and because they might be fearful of future retaliation from Selsor or others if they agreed with the prosecutor's recommended sentence. Although none of the ODC witnesses directly expressed any fear of reprisal, it was both relevant and proper for the prosecutor to have asked the jury to infer this fact from their testimony — except perhaps in the case of Knott, who, as noted, on cross-examination denied any concern for the possible ramifications caused by his testimony.

As for the prosecutor's comparison of the plight of the victims and their families with the life Selsor would lead if sentenced to a term of imprisonment, the OCCA reasonably concluded that was a valid comment on the evidence presented during the second-stage proceedings.  In cross-examining each of Selsor's ODC witnesses, the prosecutor elicited testimony indicating that Selsor, like other inmates serving terms of imprisonment, could choose whether or not to work, and could participate (and had participated) in various activities, including

83

prison rodeos and gardening. The prosecutor in turn emphasized this testimony during closing arguments to highlight for the jury the consequences of a decision to sentence Selsor to life imprisonment rather than death. To be sure, the prosecutor's related discussion of the plight of the victims and their families may have "arouse[d] [the jury's] passion," Vierick, 318 U.S. at 247, or "emotion[s]," Gardner, 430 U.S. at 358. That said, however, the prosecutor did not manipulate or misstate the evidence in that regard. Thus, as was the case in Darden, the prosecutor's remarks did not ultimately impact Selsor's right to a fair sentencing hearing.

In sum, Selsor is not entitled to federal habeas relief on the basis of his prosecutorial misconduct claim.

*7. Impermissible testimony by victim's family*

In his seventh, and final, proposition of error, Selsor contends that the trial court's admission, during the penalty-phase, of testimony from Clayton Chandler's widow and daughter "that they agreed with the prosecution's recommendation of death for Selsor," Aplt. Br. at 103-04, "served only to inflame the jury's passion and prejudice, and therefore violated the Eighth Amendment," id. at 104.

*a) Relevant background facts*

The prosecution, as part of its second-stage evidence, presented testimony from Debbie Huggins, Chandler's daughter, and Anne Chandler, Chandler's

84

widow. Both of these witnesses were allowed to read into the record written victim impact statements they had prepared prior to trial. As part of her victim impact statement, Huggins stated, "I am in agreement with the District Attorney's Office regarding the recommendation of this case." Tr., Vol. V at 1042. Similarly, Anne Chandler stated, in reading her victim impact statement, "I agree with the District Attorney's recommendations on this case." Id. at 1045. Selsor's counsel timely objected to both statements, but was overruled by the state trial court.

*b) Clearly established federal law applicable to the claim*

Selsor, citing Payne v. Tennessee, 501 U.S. 808 (1991), and Booth v. Maryland, 482 U.S. 496 (1987), contends "[t]he Supreme Court has long held that a victim-impact witness's testimony supporting a death sentence for the defendant violates the Eighth Amendment."[14] Aplt. Br. at 105. In Booth, the Court held "that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible [under the Eighth Amendment] at a capital sentencing hearing." Payne, 501 U.S. at 830 n.2. That holding was overruled by the Court in Payne. Id. at 830 & n.2. "Booth also held that the admission of a victim's family members' characterizations and opinions about the

---

[14] Selsor also cites to Woodson v. North Carolina, 428 U.S. 280, 290 (1976). Aplt. Br. at 105. Selsor does not explain, however, how Woodson supports his claim, and it is not apparent to us how Woodson is relevant.

crime, the defendant, and the appropriate sentence violates the Eighth Amendment." Id. at 830 n.2. Payne did not overrule this portion of Booth. Id.

"This circuit and several other circuits have [since] expressly recognized that the portion of Booth prohibiting family members of a victim from stating 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' during the penalty phase of a capital trial survived the holding in Payne and remains valid." Welch v. Sirmons, 451 F.3d 675, 703 (10th Cir. 2006), overruled on other grounds by Wilson v. Workman, 577 F.3d 1284 (10th Cir. 2009) (en banc).

### c) Selsor's failure to present claim to the OCCA

It is uncontroverted that Selsor never presented this claim to the OCCA. Selsor argues, however, that exhaustion of the claim was futile because the OCCA has consistently upheld admission of similar evidence. Indeed, Selsor asserts, "[t]he OCCA upheld admission of a victim's death recommendation the same day it decided [his] appeal." Aplt. Br. at 104 (citing Welch v. State, 2 P.3d 356, 373 (Okla. Crim. App. 2000) ("Victim impact testimony may include information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence.")).

A state prisoner generally may not raise a claim for federal habeas corpus relief unless he "has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To exhaust a claim, a state prisoner must pursue it

86

through "one complete round of the State's established appellate review process," giving the state courts a "full and fair opportunity" to correct alleged constitutional errors. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). If a state prisoner has not properly exhausted state remedies, the federal courts ordinarily will not entertain an application for a writ of habeas corpus unless exhaustion would have been futile because either "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. §§ 2254(b)(1)(B)(i), (ii). The state prisoner bears the burden of proving that he exhausted state court remedies, see McCormick v. Kline, 572 F.3d 841, 851 (10th Cir. 2009), or that exhaustion would have been futile, see Clonce v. Presley, 640 F.2d 271, 273 (10th Cir. 1981).

In the instant case, we conclude, out of an abundance of caution, that Selsor has sufficiently established that exhaustion of his claim with the OCCA would have been futile. In particular, Selsor correctly notes that the OCCA, both at the time it decided his direct appeal and for several years thereafter, consistently approved of the admission during second-stage capital proceedings of a "victim's opinion of [the] recommended sentence." Welch, 2 P.3d at 373; see Murphy v. State, 47 P.3d 876, 885 (Okla. Crim. App. 2002) (same).

*d) The merits of the claim*

The Supreme Court's decision in Payne and our own post-Payne cases

87

clearly establish that it is a violation of the Eighth Amendment to allow a victim

or a victim's family member to comment, during second-stage proceedings, on the

appropriate sentence for a capital defendant.  See Welch v. Workman, 607 F.3d

674, 695 (10th Cir. 2010).  Thus, we conclude that Selsor's Eighth Amendment

rights were violated by admission of the challenged testimony from Huggins and

Anne Chandler.

The question then becomes whether "the prejudicial impact of [this]

constitutional error" rises to the "substantial and injurious effect standard set

forth in" Brecht.  Fry v. Pliler, 551 U.S. 112, 120, 121 n. 3 (2007).  As we have

noted, this standard affords a state habeas petitioner plenary review to determine

whether a trial error "resulted in actual prejudice."  Id. at 637 (internal quotation

marks omitted).  A "substantial and injurious effect" exists when the court finds

itself in "grave doubt" about the effect of the error on the jury's verdict.  O'Neal

v. McAninch, 513 U.S. 432, 435 (1995).  Notably, "an error that may justify

reversal on direct appeal will not necessarily support a collateral attack on a final

judgment."  Brecht, 507 U.S. at 634.  However, "when a court is 'in virtual

equipoise as to the harmlessness of the error' under the Brecht standard, the court

should 'treat the error ... as if it affected the verdict . . . .'"  Fry, 551 U.S. at 121

n.3 (quoting O'Neal, 513 U.S. at 435).

We conclude, after "[a]ssessing the improper parts of the victim impact

evidence in the context of other evidence presented," that the improper evidence

88

"did not have an actual impact on [Selsor's] sentence." Welch, 607 F.3d at 695 (internal quotation marks omitted). To begin with, the challenged statements by Huggins and Anne Chandler did not expressly refer to Selsor being put to death; instead, they both simply stated without embellishment they agreed with the prosecution's "recommended sentence." Further, the evidence presented by the prosecution overwhelmingly supported the two aggravating circumstances found by the jury. Indeed, those circumstances were all but uncontroverted. Moreover, although the jury did not find that Selsor represented a continuing threat to society, the prosecution's evidence of Selsor's role in a string of violent robberies nevertheless painted a picture of Selsor that was certainly less than flattering, and that weighed heavily in favor of imposition of the death penalty. As for Selsor's own mitigating evidence, it was, quite frankly, less than compelling. Although all four of the ODC witnesses testified they disagreed with the imposition of the death penalty for Selsor, two of those witnesses conceded that Selsor's prison record was simply "a little bit better than average," Tr., Vol. V at 1124 (testimony of Knott); id. at 1135 (testimony of Cook), and one of those witnesses effectively conceded that Selsor remained a threat, id. at 1098 (testimony of Williamson). Lastly, "the jury was [properly] instructed on the use of mitigating evidence and its role in the sentencing deliberations." Welch, 607 F.3d at 695. Considered together, the challenged victim impact statements did not "so clearly sway[] the jury as to cause [Selsor] actual prejudice as required by Brecht." Id.

89

AFFIRMED.